## LEASE AGREEMENT

**THIS LEASE AGREEMENT** (the "Lease"), executed in two or more counterparts, is made and entered into effective as of the 21st day of November, 2002, by and between J.A. Peterson Enterprises, Inc., a Missouri corporation, hereinafter called the "Landlord", whose address for the purpose of this Lease is 10000 W. 75th Street, Suite 100, Shawnee Mission, Kansas 66204, and Hy-Vee, Inc., an Iowa corporation, hereinafter called the "Tenant", whose address for the purpose of this Lease is 5820 Westown Parkway, West Des Moines, Iowa 50266;

**WITNESSETH THAT:**

**IN CONSIDERATION** of the mutual covenants herein contained, the parties hereto hereby agree as follows:

1. **PREMISES.**

    A. **DEMISED PREMISES.** Landlord does hereby demise and lease unto Tenant, and Tenant does lease and take from Landlord, in "as is" condition, the following described premises, hereinafter referred to as the "Demised Premises", now or hereafter to be erected in Creekwood Commons Shopping Center in the city of Kansas City, Clay County, Missouri, hereinafter referred to as the "Shopping Center":

    a store unit measuring approximately 350 feet in width by a depth of approximately 220 feet and containing a total area of approximately 77,000 square feet.

Any measurements herein specified are from the exterior of the outside walls of the building and to the center of the interior walls. The approximate boundaries and location of the Demised Premises are shown hatched on the site plan of the Shopping Center, which is marked Exhibit "B" attached hereto and made a part hereof, and the Shopping Center itself is outlined in blue on said exhibit and more particularly described in Exhibit "A" attached hereto and by this reference made a part hereof.

Tenant acknowledges that at the time of execution of this Lease, the Demised Premises are leased to 1/2 Price Store, Inc. ("1/2 Price") pursuant to a Lease dated January 29, 1988 (the "Existing Lease"). Landlord has entered into a new lease (the "New Gordmans Lease") with an affiliate of 1/2 Price ("Gordmans") for new space in the Shopping Center (the "Gordmans Space"). Gordmans is performing renovation in the Gordmans Space and is scheduled to complete such renovation and move out of the Demised Premises on or before April 19, 2002. Tenant understands that Section 8.03 of the Existing Lease (a copy of which Section is attached hereto as Exhibit E) states 1/2 Price's obligations relating to the condition of the Demised Premises upon the termination of the Existing Lease. Landlord has obligated 1/2 Price to surrender the Demised Premises in accordance with the terms of the Existing Lease and Tenant agrees that it shall accept the Demised Premises in such condition. Landlord agrees to perform such work as may be necessary to cause the Demised Premises to conform with the conditions required by Exhibit "E".

1

Notwithstanding anything in this Lease to the contrary, the parties acknowledge and agree that Landlord shall have the right to terminate this Lease at any time prior to Landlord and Gordmans agreeing to and executing the New Gordmans Lease; PROVIDED, HOWEVER, in no event shall Landlord deliver such notice after November 25, 2002.

B. **COMMON AREAS.** In addition to the occupancy of the Demised Premises, but subject to the provision of Section 2, Tenant and Tenant's concessionaires, officers, employees, agents, customers, and invitees also shall have the right to the nonexclusive use of those portions of the Shopping Center provided from time to time for the common or joint use and benefit of Landlord, the occupants of the Shopping Center, and their employees, agents, servants, customers and other invitees, including automobile parking areas, access roads, truck loading areas, delivery areas, walkways, bus stops, shopping center identification signs, common utility lines, landscaped areas, driveways, and sidewalks hereinafter collectively are referred to as the "Common Areas". Landlord agrees to make the Common Areas available to Tenant for nonexclusive use by Tenant and the other aforementioned groups of persons during the term of this Lease, except when portions thereof temporarily may be unavailable for use in order to (x) make repairs, changes and additions thereto, (y) prevent a dedication thereof or the accrual of any prescriptive rights to any person or the public therein, and (z) discourage non-customer parking. The nonexclusive use of the Common Areas by Tenant and Tenant's concessionaires, officers, employees, agents, customers, and invitees at all times shall be subject to such reasonable rules and regulations as Landlord from time to time may establish and shall be in common with other tenants from time to time of the Shopping Center.

**RESTRICTIONS OF USES.** Tenant covenants and agrees that it shall not use or permit the use of all or any portion of the Demised Premises for any of the uses set forth on Exhibits "F" or "G" attached hereto and incorporated herein by reference. Landlord covenants and agrees that it shall not permit the use or operation of any remaining portion of the Shopping Center for any of the uses prohibited in the Shopping Center as set forth on Exhibit "G" attached hereto and incorporated herein by reference.

2. **PARKING AREA.** The Landlord will provide parking areas as required by law for the use of the customers, suppliers, and employees of Tenant and other occupants of the Shopping Center. Landlord agrees that the parking areas within the Shopping Center shall (a) consist of a paved area providing not less than ten (10) parking spaces per one thousand (1,000) square feet of gross leasable building space in the Shopping Center used for restaurant purposes (take-out or sit-down) or five (5) parking spaces per one thousand (1,000) square feet of gross leasable building space for all other permitted uses; (b) include a paved area herein known as "Tenant's Prime Parking Area" outlined in green on Exhibit "B"; (c) have adequate entrances and exists to main thoroughfares; and (d) be contiguous to the Demised Premises or other leasable space in the Shopping Center. Subject to the preceding sentence,(i) all Common Areas (other than Tenant's Prime Parking Area) shall be subject to the exclusive control and management of Landlord, and Landlord shall have the right at any time, once or more often, to change the size, area, level, location and arrangement of the access roads, parking areas, and other Common Areas and to construct buildings and other improvements thereon and therein; PROVIDED, HOWEVER, Landlord agrees that it shall not make any such changes or modifications to the parking areas or

2

access drives which require a plan amendment with the City without Tenant's prior written consent, which shall not be unreasonably withheld, delayed or conditioned; and (ii) Landlord shall have the right to do and perform such other acts in and to the Common Areas (excluding Tenant's Prime Parking Area) as Landlord shall determine to be advisable with a view to the improvement of the convenience and use thereof by tenants of the Shopping Center and their customers, including the right to permit Landlord to conduct promotions in and to decorate the sidewalks and parking areas.

3.     **TERM.**   The term of this Lease shall be for twenty (20) years following the commencement of the term unless sooner terminated or extended as herein provided.

4.     **COMMENCEMENT OF TERM AND POSSESSION.**

A.     **COMMENCEMENT OF TERM.**  The term of this Lease and Tenant's obligation to pay full rental hereunder shall commence January 1, 2004, or the date on which the Tenant shall open the Demised Premises to the public, whichever of said dates shall first occur (the "Commencement Date").

B.     **TENANT'S WORK AND EARLY POSSESSION.**  The provisions of Section 4(A) notwithstanding, Tenant shall have possession of the Demised Premises from and after the later of (i) April 1, 2003, or (ii) the date 1/2 Price surrenders the Demised Premises to Landlord (the "Possession Date"), to perform remodeling and restoration work in the Demised Premises, in accordance with plans and specifications to be approved by Landlord ("Tenant's Work"). The parties agree that there shall be a day extension of the January 1, 2004 date set forth in Section 4(A) above for each day that the Possession Date occurs after April 1, 2003. Tenant shall perform all of its obligations under this Lease (except its obligations to pay rent and other amounts hereunder, but excluding from this exception the amounts incurred by Tenant relating to Tenant's Work) from the Possession Date until the Commencement Date, in the same manner as though the term began when the Demised Premises were so made available to Tenant.

Tenant shall construct the Demised Premises in accordance with the provisions of Exhibit "H". All of Tenant's Work with respect to utility installations shall also be subject to approval, when applicable, by the utility company furnishing the service. Tenant shall, at its expense, promptly obtain from its contractor and from its contractor's subcontractors, and its and their materialmen, from time to time, partial and full lien waivers and such other information as Landlord shall reasonably request in order to insure compliance with the provisions of this Lease. Landlord or an authorized utility company, shall have the right to run utility lines, pipes, conduits and duct work where necessary or desirable, through attic space, column space or other similar areas of the Demised Premises, and to repair, alter, replace or remove the same, all in a manner which does not interfere unnecessarily with Tenant's use thereof, and Tenant shall not be entitled to an abatement or reduction of rent or to claim an actual or constructive eviction by reason thereof. All work by Landlord and Tenant shall comply with all applicable statutes, ordinances, regulations and codes and with the recommendations of Landlord's hazard insurance carrier.

3

## OPTIONS TO EXTEND.

(A)     (1)     If Tenant is not then in default under any of the terms and provisions of this Lease, Tenant shall have the option to extend the term of this Lease for an additional term (sometimes in this Lease referred to as the "first additional term") of five (5) years, from and after the expiration of the initial term of this Lease, upon the giving of written notice of the exercise of such option to Landlord at least one hundred eighty (180) days prior to the expiration of the initial term of this Lease. If said option is duly exercised, this Lease term shall be automatically extended for the first additional term without the requirement of any further instrument upon all of the same terms, provisions and conditions set forth in this Lease, except annual base rent which shall be increased to Four Hundred Sixty-nine Thousand Seven Hundred and no/100 Dollars ($469,700.00) per year, payable in equal monthly installments, in advance of Thirty-nine Thousand One Hundred Forty-one and 67/100 Dollars ($39,141.67).

(2)     If Tenant exercises its first option to extend the term of this Lease and is not then in default under any of the terms and provisions of this Lease, then Tenant shall have the option to further extend the term of this Lease for a second additional term (sometimes in this Lease referred to as the "second additional term") of five (5) years, from and after the expiration of the first additional term of this Lease, upon the giving of written notice of the exercise of such option to Landlord at least one hundred eighty (180) days prior to the expiration of the first additional term of this Lease. If said option is duly exercised, this Lease term shall be automatically extended for the second additional term without the requirement of any further instrument upon all of the same terms, provisions and conditions set forth in this Lease, except annual base rent which shall be increased to Four Hundred Eighty-eight Thousand Nine Hundred Fifty and no/100 Dollars ($488,950.00) per year, payable in equal monthly installments, in advance of Forty Thousand Seven Hundred Forty-five and 83/100 Dollars ($40,745.83).

(3)     If Tenant exercises its second option to extend the term of this Lease and is not then in default under any of the terms and provisions of this Lease, then Tenant shall have the option to further extend the term of this Lease for a third additional term (sometimes in this Lease referred to as the "third additional term") of five (5) years, from and after the expiration of the second additional term of this Lease, upon the giving of written notice of the exercise of such option to Landlord at least one hundred eighty (180) days prior to the expiration of the second additional term of this Lease. If said option is duly exercised, this Lease term shall be automatically extended for the third additional term without the requirement of any further instrument upon all of the same terms, provisions and conditions set forth in this Lease, except annual base rent which shall be increased to Five Hundred Eight Thousand Two Hundred and no/100 Dollars ($508,200.00) per year, payable in equal monthly installments, in advance of Forty-two Thousand Three Hundred Fifty and 00/100 Dollars ($42,350.00).

4

(4)    If Tenant exercises its third option to extend the term of this Lease and is not then in default under any of the terms and provisions of this Lease, then Tenant shall have the option to further extend the term of this Lease for a fourth additional term (sometimes in this Lease referred to as the "fourth additional term") of five (5) years, from and after the expiration of the third additional term of this Lease, upon the giving of written notice of the exercise of such option to Landlord at least one hundred eighty (180) days prior to the expiration of the third additional term of this Lease. If said option is duly exercised, this Lease term shall be automatically extended for the fourth additional term without the requirement of any further instrument upon all of the same terms, provisions and conditions set forth in this Lease, except annual base rent which shall be increased to Five Hundred Twenty-seven Thousand Four Hundred Fifty and no/100 Dollars ($527,450.00) per year, payable in equal monthly installments, in advance of Forty-three Thousand Nine Hundred Fifty-four and 17/100 Dollars ($43,954.17).

(5)    If Tenant exercises its fourth option to extend the term of this Lease and is not then in default under any of the terms and provisions of this Lease, then Tenant shall have the option to further extend the term of this Lease for a fifth additional term (sometimes in this Lease referred to as the "fifth additional term") of five (5) years, from and after the expiration of the fourth additional term of this Lease, upon the giving of written notice of the exercise of such option to Landlord at least one hundred eighty (180) days prior to the expiration of the fourth additional term of this Lease. If said option is duly exercised, this Lease term shall be automatically extended for the fifth additional term without the requirement of any further instrument upon all of the same terms, provisions and conditions set forth in this Lease, except annual base rent which shall be increased to Five Hundred Forty-six Thousand Seven Hundred and no/100 Dollars ($546,700.00) per year, payable in equal monthly installments, in advance of Forty-five Thousand Five Hundred Fifty-eight and 33/100 Dollars ($45,558.33).

(6)    If Tenant exercises its fifth option to extend the term of this Lease and is not then in default under any of the terms and provisions of this Lease, then Tenant shall have the option to further extend the term of this Lease for a sixth additional term (sometimes in this Lease referred to as the "sixth additional term") of five (5) years, from and after the expiration of the fifth additional term of this Lease, upon the giving of written notice of the exercise of such option to Landlord at least one hundred eighty (180) days prior to the expiration of the fifth additional term of this Lease. If said option is duly exercised, this Lease term shall be automatically extended for the sixth additional term without the requirement of any further instrument upon all of the same terms, provisions and conditions set forth in this Lease, except annual base rent which shall be increased to Five Hundred Sixty-five Thousand Nine Hundred Fifty and no/100 Dollars ($565,950.00) per year, payable in equal monthly installments, in advance of Forty-seven Thousand One Hundred Sixty-two and 50/100 Dollars ($47,162.50).

5

(B)    If Tenant elects to exercise its option for any Option Period, Tenant shall do so by giving Landlord notice of such election (the "Option Notice"), in accordance with the provisions of Section 36 of the Lease.

(C)    Any holding over or failure to vacate the Demised Premises at the end of any term shall not be deemed or construed to be an exercise of an Option Period or an extension of the Lease. Any termination of the Lease shall terminate Tenant's rights of further extension hereunder.

6.    **RENT.** Tenant agrees to pay to Landlord at the office of Landlord, or at such other place designated by Landlord rent at the rate of Four Hundred Fifty Thousand Four Hundred Fifty and no/100 Dollars ($450,450.00) per year, payable, without any prior demand, deduction or setoff (except as may be specifically provided for elsewhere in this Lease), in equal monthly installments, in advance, of Thirty-seven Thousand Five Hundred Thirty-seven and 50/100 Dollars ($37,537.50) per month, beginning on the Commencement Date and thereafter on the first day of each succeeding calendar month during the initial 20 year term of this Lease. If the term shall commence upon a day other than the first day of a calendar month, then Tenant shall pay, upon the Commencement Date, a pro rata portion of the fixed monthly rent described in the foregoing clause prorated on a per diem basis with respect to the fractional calendar month. Tenant shall pay as "additional charges", all amounts required to be paid by Tenant under this Lease, whether or not the same are designated "additional charges". All "additional charges" shall be deemed rent for the sole purpose of Landlord's exercise of remedies in the event of a default under this Lease.

7.    **REAL ESTATE TAXES.** The term "Taxes" means the aggregate of the real estate taxes, assessments and other governmental charges and levies, general and special, ordinary and extraordinary, foreseen and unforeseen, of any kind or nature whatsoever (including assessments for public improvements or benefits [whether for on or off-site improvements] and special or installment tax bills and interest on unpaid installments thereof) which may be levied, assessed or imposed or become liens upon the Shopping Center, or which Landlord is contractually obligated to pay, or which arise out of the use, occupancy or possession of the Shopping Center (land, buildings, leasehold improvements, betterments and other permanent improvements) from time to time. The term "Taxes" shall not, however, include inheritance, estate, succession, transfer, gift, franchise, corporation, income or profit tax imposed upon Landlord, nor penalties imposed upon Landlord for Landlord's delinquent payment of the Taxes; PROVIDED, HOWEVER, that if at any time during the term the methods of taxation prevailing at the commencement of the term shall be altered so that in addition to or in lieu of or as a substitute for the whole or any part of the Taxes now levied, assessed or imposed on real estate as such there shall be levied, assessed or imposed (i) a tax on the rents received from the Shopping Center; or (ii) a license fee measured by the rents receivable by Landlord from the Shopping Center; or (iii) a tax or license fee imposed upon Landlord which is otherwise measured by or based in whole or in part upon the Shopping Center or any portion thereof, then such tax or fee shall be included in the computation of Taxes, computed as if the amount of such tax or fee so payable were that part due if the Shopping Center were the only property of Landlord subject thereto.

6

(B)     The term "Tax Year" means the 12-month period established as the real estate tax year by the taxing authorities having jurisdiction over the Shopping Center.

The term "Tenant's Tax Charge" means an amount equal to the product obtained by multiplying the sum of the Taxes for each Tax Year plus all costs, expenses, appraisers' fees and attorneys' fees (PROVIDED, HOWEVER, such fees may only be charged to the extent such protest has resulted in such Taxes or proposed Taxes being reduced) incurred by Landlord in contesting any Taxes, proposed Taxes or reassessment during such Tax Year (which Landlord may do at its option) by Tenant's Percentage (hereinafter defined).   For the Tax Year in which this Lease commences or terminates, Tenant's Tax Charge shall be prorated on the basis of a 365-day year. Tenant shall not be obligated to pay for any Taxes applicable to any period prior to the Commencement Date.   If a portion of the land and improvements in the Shopping Center is separately assessed and the real estate taxes thereon are paid by the occupant of such land, then (i) the Taxes shall exclude the amount of such separately assessed and paid Taxes, and (ii) the denominator of the fraction set forth in this paragraph shall exclude the Gross Leasable Area of the improvements on such separately assessed land.   Notwithstanding the foregoing, only "Outparcel One" and "Outparcel Two" (as shown on the Site Plan) may be separately assessed.

(C)     Tenant's Tax Charge shall be paid to Landlord, as additional charges, within 15 days after receipt of notice from Landlord; PROVIDED, HOWEVER, Tenant shall not be required to pay Tenants Tax Charge to Landlord more than 30 days prior to the due date of the installment of the Taxes involved.

(D)     Tenant shall pay (or reimburse Landlord upon demand if the same are levied against Landlord or the Shopping Center), before delinquency, any and all taxes, assessments, license fees and public charges, of whatever kind or nature, levied or assessed during the term by any governmental authority against Tenant's business in the Demised Premises and the fixtures, furniture, appliances and any other personal property therein.

(E)     Landlord shall have the right (but not the obligation), if permitted by law, to make installment payments of any Taxes levied against the Shopping Center, and in such event, Tenant's share of the Taxes shall be computed upon the installments and interest thereon paid by Landlord in each Tax Year; PROVIDED, HOWEVER, if any Taxes exceeds $5,000.00 in cost and is payable in installments, Tenant's share of such Tax shall be computed as if Landlord had elected to pay such Tax in installments over the longest period permitted by law (irrespective of whether Landlord elects to pay in such manner), and Tenant's share of the Taxes shall include only those installments (and interest thereon) which would have become due during the term.   Landlord shall have the sole right (but not the obligation) to contest the validity or amount of any Tax by appropriate proceedings, and if Landlord shall voluntarily institute any such contest, it shall have the sole right to settle any negotiation, contest, proceeding or action upon whatever terms Landlord may, in its sole discretion, determine.   If Landlord receives any refund of such Taxes, Landlord shall credit such proportion of the refund as shall be allocable to Tenant's Tax Charge against the next succeeding payments of Tenant's Tax Charge due from Tenant, except during the last Lease Year of the term, Landlord will refund such excess to Tenant within 30 days following the expiration of the term provided Tenant has discharged all of its obligations under this Lease.

7

(F)     In the event of any dispute under this Section, Tenant shall pay Tenant's Tax Charge in accordance with the applicable bill or statement, and such payment shall be without prejudice to Tenant's position.  If the dispute shall be determined in Tenant's favor, by agreement or otherwise, Landlord shall pay to Tenant the amount of Tenant's overpayment resulting from compliance with such bill or statement.  Any such bill or statement shall be deemed binding and conclusive if Tenant fails to object thereto within 30 days after receipt thereof.

(G)     "Tenant's Percentage" share shall be computed by using a fraction, the numerator of which shall be the number of square feet of Gross Leasable Area in the Demised Premises, and the denominator of which shall be the number of square feet of Gross Leasable Area in the Shopping Center as of the first day of such Tax Year.  "Gross Leasable Area" as used in this Lease means the number of square feet of floor space measured from the exterior faces of exterior walls and the center line of interior or party walls.  No deduction or exclusion from Floor Area shall be made by reason of columns, stairs, elevators, escalators, or other interior construction or equipment.

8.     **INSURANCE**.

A.     **HAZARD INSURANCE.** Tenant shall keep, at Tenant's sole cost and expense throughout the term of this Lease, the Demised Premises and Tenant's Prime Parking Area insured against all risks of direct physical loss, including (without limitation) loss by fire, lightening and other risks which at the time are included under Special Form Coverage (sometimes referred to as "Special Extended Coverage") in an amount not less than the replacement cost thereof. Tenant's deductible under such insurance shall not be greater than $50,000, PROVIDED, HOWEVER, such deductible may be up to $500,000 in the event Tenant's net worth is high enough to permit Tenant to self-insure as set forth in sub-section D hereof.  Notwithstanding anything in this Section 8(A) to the contrary, in the event Landlord is required by a mortgagee of all or any portion of the Shopping Center to keep the Demised Premises and/or Tenant's Prime Parking Area insured, then Tenant shall pay Tenant's Percentage of all such required insurance costs within 15 days after notice thereof from Landlord.

B.     **PUBLIC LIABILITY.** Tenant, at its expense at all times during the term of this Lease and any other period of occupancy of the Demised Premises by Tenant, shall provide and maintain with respect to the Demised Premises and Tenant's Prime Parking Area general public liability insurance in the form customarily written for the protection of owners, landlords, and tenants of real estate, which insurance shall provide coverage of not less than $5,000,000 for personal injury and $500,000 for property damage.

C.     **GENERALLY.** Tenant shall deliver certification of its insurance coverage to Landlord. Landlord shall be named as an additional insured on all such policies and all certificates shall certify that they will not be terminated without the prior written consent of Landlord.   Notwithstanding anything to the contrary contained within this section, Tenant's obligation to carry the insurance provided for herein may be brought within the coverage of a so-called blanket policy or policies of insurance carried and maintained by Tenant; PROVIDED, HOWEVER, that the coverage afforded Landlord will not be reduced or diminished or otherwise be

8

different from that which would exist under a separate policy meeting all of the requirements of this Lease by reason of the use of such blanket policy of insurance.

D.    **RIGHT TO SELF-INSURE.** To the extent permitted by any mortgagee of Landlord on the Shopping Center, Tenant may elect to carry any insurance required to be maintained under this lease, either in whole or in part, under any plan of self-insurance which Tenant may from time to time have in effect, provided (i) that Tenant shall have and maintain a net worth (exclusive of good will or other intangibles) determined in accordance with generally accepted accounting principles and practices, consistently applied, of $50,000,000.00; and (ii) Tenant may not self-insure more the first $2,000,000.00 of the $5,000,000.00 of liability insurance required by Section 8(B).

The foregoing right to self-insure is subject to the further condition that in the event of any casualty which would have been insured under 8A of this lease, Tenant agrees to promptly repair and restore the Demised Premises at Tenant's sole cost and expense to the former condition immediately prior to such casualty. If such casualty shall be of a nature or extent such that Tenant would be allowed and does elect to terminate this lease under the provisions of paragraph 14 hereof, Tenant shall pay to Landlord and Landlord's mortgagee an amount equal to the full replacement cost, as determined by a qualified insurance adjuster acceptable to Landlord, Tenant and Landlord's mortgagee, of the Demised Premises in the case of the total destruction or the full cost of restoration and repair in the case of a partial destruction.

Tenant acknowledges the interest of Landlord's mortgagee in the Demised Premises and agrees that any amounts payable to Landlord under the provisions of this subparagraph D shall be payable jointly to Landlord and Landlord's mortgagee.

9.    **UTILITIES.** Tenant shall install and use the utilities (including, without limitation, water, gas, electricity, sewers, and telephone supplied to or serving the Demised Premises) in accordance with the rules and regulations of the public utility company or the governmental agency supplying the same and in accordance with the provisions of Exhibit "H" attached hereto and incorporated herein by reference. All utility costs shall be paid for by Tenant.

Landlord shall not be liable in any way to Tenant or to any other party occupying any part of the Demised Premises for any failure or defect in the supply or character of any utility service furnished to the Demised Premises or the Common Areas, by reason of any requirement, act or omission of the public utility company serving the Shopping Center with electricity, gas, water or other utility service, or because of necessary repairs or improvements, or by reason of any cause referred to in Section 37.

10.    **MAINTENANCE AND REPAIRS - DEMISED PREMISES.**

A.    **BY LANDLORD.** Landlord shall have no responsibility for any repairs or maintenance relating to the Demised Premises.

Case 4:22-cv-00192-BP    Document 1-1    Filed 03/22/22    Page 9 of 54

B. **BY TENANT.** Tenant agrees that from and after the Possession Date and until the end of the term hereof, it will be responsible for all repairs and maintenance to the Demised Premises. Tenant shall keep the Demised Premises in good order and condition, and shall make all necessary or appropriate repairs, interior and exterior, structural and non-structural, ordinary and extraordinary, and foreseen and unforeseen to the building and other improvements making from time to time making up the Demised Premises. All repairs effected by Tenant shall be in all respect of a standard at least substantially equal in quality of material and workmanship to the original work and material in and on the Demised Premises and shall meet the requirements of municipal and governmental authorities. Tenant agrees that Landlord shall have no obligation under this Lease at any time during the term to make any repairs or replacements of any part of the Demised Premises or any alteration, addition, change, substitution or improvement thereof or thereto, whether structural or otherwise. The intention of this Lease is that the rent received by Landlord shall be free and clear of any expense incurred by Landlord under this Lease in connection with any construction, care, maintenance, operation, repair, replacement, alteration, addition, change, substitution and improvement of or to the Demised Premises. Tenant shall at its cost procure and maintain in the Building all safety appliances required by Tenant's hazard carrier to be maintained therein.

C. **INSURED EXPENSE.** Notwithstanding anything in this Section 10 to the contrary, if any repair or restoration, which Tenant is required hereunder to make, is the subject of insurance maintained on behalf of Landlord and Tenant has been paying Tenant's Percentage of the cost of such insurance, Landlord will after Tenant has properly completed such repair or restoration remit to Tenant the net proceeds of insurance received therefor by Landlord and attributable to such repair or restoration, but in an amount not exceeding Tenant's cost thereof.

11. **COMMON AREA MAINTENANCE AND COSTS.**

A. **MAINTENANCE OF COMMON AREAS.** Landlord shall operate and maintain the Common Areas, other than Tenant's Prime Parking Area, during the term of this Lease in good order and repair in accordance with reasonable standards of shopping center cleanliness and maintenance. Tenant shall at all times during the term of this Lease, maintain Tenant's Prime Parking Area (including all landscaping and other improvements located therein) in good order and repair in accordance with reasonable standards of shopping center cleanliness and maintenance and make all necessary replacements thereto and in all events in equal or superior condition and repair to the remainder of the Common Areas.

B. **COST OF COMMON AREA MAINTENANCE.** Tenant shall pay the entirety of the expense of maintaining Tenant's Prime Parking Area. Landlord shall pay the entirety of the expense of maintaining the remainder of the Common Area without contribution from Tenant. Notwithstanding the foregoing, in the event Tenant is no longer operating a supermarket in the Demised Premises or has assigned or sublet the Lease, and Landlord reasonably believes that Tenant is not maintaining Tenant's Prime Parking Area in equal or superior condition and repair to the remainder of the Common Areas, then upon 30 days prior notice to Tenant, Landlord may take over the maintenance of Tenant's Prime Parking Area ("Landlord's Takeover Right") and from and after the date Landlord takes over such maintenance, Tenant shall be responsible to pay Tenant's

10

Percentage of the "Common Area Expenses" (hereinafter defined).

The term "Common Area Expenses" shall mean the total cost (other than the cost properly chargeable to capital account, except as herein specifically provided) and expense incurred in operating, maintaining, equipping, inspecting, insuring, protecting, and repairing the Common Areas in the Shopping Center and insuring the buildings and improvements in the Shopping Center (whether Common Areas or otherwise), including the cost or expense of or incurred in connection with or reasonably attributable to: water, gas, electricity and other utilities; gardening and landscaping (including planting, replanting and replacing flowers, shrubs and trees); cleaning; lighting; public liability (including "umbrella coverage"), workmen's compensation, and hazard insurance (including fire and extended coverage [with vandalism and malicious mischief endorsement], machinery, rental value and all-risk or "DIC" policies); fire protection (including installation and maintenance of an ADT or similar type system); the on or off-site water retention or detention pond(s) serving the Shopping Center; fees for required licenses; personal property taxes; line painting; operating of loudspeakers and other equipment supplying music; sanitary control; security services (if any); sewer service charges; removal of ice, snow, trash, rubbish, debris, garbage and other refuse; depreciation on machinery and equipment used in such maintenance and depreciation on vehicles used in connection with security; resurfacing and restriping of parking areas; personnel to provide and supervise such services (including wages, unemployment and social security taxes, workmen's compensation insurance and the cost of uniforms for such personnel); periodic depreciation calculated in accordance with generally accepted accounting principles of the cost or expense of any repair, maintenance, renovation and replacement of any part of the Common Areas, including fixtures, furnishings and equipment therein, the cost of which is not paid for out of insurance proceeds, plus interest thereon at the Interest Rate; repairing, maintaining and operating the entrance drives, traffic signalization and deceleration lanes on or adjacent to the Entire Premises (whether or not the same be located in the Shopping Center); plus an amount equal to 15% of the total of all the foregoing as an agreed upon reimbursement covering the administrative costs to be incurred by Landlord in connection with the operation of the Common Areas, whether or not located in the Shopping Center.

Tenant's Percentage of Common Area Expenses shall be paid in monthly installments on the first day of each calendar month in advance during the term in an amount reasonably estimated by Owner. Within 90 days after the end of each Fiscal Year, Owner shall furnish Tenant with a statement (the "Statement") summarizing Tenant's Percentage of Common Area Expenses for the preceding Fiscal Year and setting forth the method by which Tenant's Percentage of Common Area Expenses was determined. In the event the amounts paid by Tenant during the preceding period shall be in excess of its estimated and paid Pro Rata Share, the excess shall be credited against the next ensuing payment of any kind due from Tenant under this Lease; in the event the amount paid by Tenant shall be less than its estimated and paid Pro Rata Share, then it shall pay the remaining balance within thirty (30) days after such notice is furnished. The notice furnished to Tenant shall also include a computation of the estimated sums that would be due from Tenant each month for the ensuing year and the monthly Common Area contribution to be made as aforesaid shall be adjusted accordingly for the ensuing period. Any claim by Tenant for revision of any Statement submitted by Owner hereunder for any such Fiscal Year, which claim is not made within 60 days after the receipt of such Statement, shall be deemed waived and discharged. For the

11

Fiscal Year in which this Lease commences or terminates, Tenant's Percentage of Common Area Expenses shall be prorated if applicable, on the basis of a 365 day year.

The parties acknowledge that there is no way to separate the costs of lighting Tenant's Prime Parking Area from the remainder of the Common Areas or to separate the cost of maintaining the "New Center Pylon Sign" (hereinafter defined). Therefore, notwithstanding the provisions of the first paragraph of this Section 11(B), Tenant shall pay Tenant's Percentage of the costs of lighting the Common Areas and of operating and maintaining the New Center Pylon Sign in monthly estimates in accordance with the provisions of the foregoing paragraph.

12. **ALTERATIONS AND SIGNAGE.**

A. **ALTERATIONS.** Landlord agrees that Tenant may make at its own expense such interior nonstructural alterations to the Demised Premises as it deems appropriate without the requirement of Landlord's prior approval, but provided that the overall value of the Demised Premises shall not be diminished by said alterations and that no structural or exterior alterations shall be performed without Landlord's prior written approval, which approval shall not be unreasonably withheld, conditioned or delayed. Prior to making any alterations in the Demised Premises, Tenant shall give Landlord notice thereof.

B. **SIGNAGE.** Tenant shall be permitted to construct at Tenant's expense no more than one pedestal, monument or other similar sign within the Common Area adjacent to the entrance to Englewood Road closest to the Demised Premises. Tenant shall maintain such sign as part of and in the same manner as Tenant's Prime Parking Area. In addition, Landlord agrees to cooperate with Tenant to try and obtain governmental approval for remodeling of the existing shopping center pylon sign (the "New Center Pylon Sign") at the corner of Engelwood Road and North Oak Street Trafficway. The parties agree that such New Center Pylon Sign shall consist of the following three parts: (1) the name of the Shopping Center; (2) Tenant's signage, and (3) Gordman's signage. Tenant agrees that Gordman's signage may be of equal or lesser size, provided Tenant's signage shall be above Gordman's signage. Tenant shall pay for one-third (1/3rd) of the cost of designing and constructing the new Center Pylon Sign and obtaining all governmental approvals for the same, provided Tenant shall obtain all requisite governmental approvals and consents and Tenant shall obtain the prior written approval of Landlord with respect to location and design thereof, which Landlord approval shall not be unreasonably withheld, conditioned or delayed.

13. **ASSIGNMENT OR SUBLETTING.**

A. Tenant shall have the right, without Landlord's consent, to assign this Lease or to sublet any portion of the Demised Premises to any third party; PROVIDED, HOWEVER, the parties agree that Tenant shall not have the right to subdivide the Demised Premises if such subdivision would result in all such subdivided portions of the Demises Premises containing <40,000 square feet of Gross Leasable Area, without Landlord's prior written consent, which consent may unreasonably withheld, conditioned or delayed in Landlord's sole discretion. For purposes of this subdividing restriction only, at least 20,000 square feet of Gross Leasable Area of

12

the portion of the Demised Premises containing >40,000 square feet must be contained in the eastern half of the Demised Premises. In the event of any assignment or subletting, Tenant shall remain liable for all rent and other payments due and for all covenants and obligations of Tenant under this Lease. Further, in the event of any such assignment or subletting, a copy of such assignment or subletting must be given to Landlord and as a condition to any assignment of this Lease by Tenant which is permitted hereunder, the assignee thereof shall be required to execute and deliver to Landlord an agreement, in recordable form, whereby such assignee assumes and agrees with Landlord to discharge all obligations of Tenant under this Lease.

        B.    If Landlord conveys or transfers its interest in the Shopping Center or in this Lease (which sale or transfer may be effected without Tenant's consent), upon such conveyance or transfer, Landlord (and in the case of any subsequent conveyances or transfers, then upon such grantee assuming the lessor's obligations under this Lease, the then grantor or transferor) shall be entirely released and relieved from all liability with respect to the performance of any covenants and obligations on the part of Landlord to be performed under this Lease from and after the date of such conveyance or transfer.

        14.    **DAMAGES TO OR DESTRUCTION OF DEMISED PREMISES.** If the Demised Premises or any portions thereof are damaged or destroyed by fire or other casualty, Tenant shall have the obligation to repair and restore the Demised Premises to the former condition just prior to the loss. Notwithstanding the foregoing, in the event (i) the Demised Premises or any portions thereof are so damaged or destroyed by fire or other casualty so as to render the Demised Premises unfit for occupancy, during the last five years of the initial term or during any option period (and Tenant has not exercised the next option prior to such damage or destruction), and (ii) the Demised Premises cannot reasonably be repaired and restored within two hundred ten (210) calendar days from such damage, then Tenant shall have the privilege of canceling this Lease by giving written notice to Landlord within thirty (30) days after such damage, and the proceeds of the fire and extended coverage insurance policy plus the amount of any deductible shall be paid to and be the sole property of Landlord. In such case, Tenant shall be entitled to receive a prorated refund of any rent and other charges paid in advance. If Tenant elects not to give notice of cancellation, then Tenant shall repair and restore the Demised Premises to the former condition just prior to the loss, and the insurance proceeds shall be applied to such repairs and restoration. Any excess insurance proceeds shall be paid to Landlord. Tenant shall not be entitled to any abatement or reduction of rent due to such damage or destruction and all base rent, additional charge and other charges under this Lease shall continue to be paid during any reconstruction periods.

        15.    **CONDEMNATION.**

        A.    **COMPLETE TAKING.** In the event that the whole of the Demised Premises is taken for public or quasi-public purposes by the government of the United States, the state of Missouri, the city of Kansas City, or any government or power whatsoever, or by any corporation under the right of eminent domain, or should the whole of the Demised Premises be condemned by any court, city, county, state, or governmental authority or office, department or bureau of any city, county, state, or of the United States, then in any such event this Lease shall terminate as of the date title to the Demised Premises vests in the condemning authority. For the

purposes hereof, such date of vesting in the condemner terminating this Lease shall operate as though it were the date originally intended by the parties for expiration of the tenancy created hereunder, and the rent reserved herein shall be adjusted in the light of the condemnation, so that Tenant shall pay rent to Landlord only up to the date of vesting in the condemner. Any prepaid or advance rental or other amounts to be paid by Tenant under this Lease paid by Tenant to Landlord or third party for that part of the term extending beyond the date on which the title vests in the condemner shall be refunded within three (3) days after Landlord has received an award of just compensation from the condemning authority for the taking of the Demised Premises, provided Tenant shall have duly performed all the covenants and conditions of this Lease by it to be performed.

B. **PARTIAL TAKING.** In the event (1) any portion of the Demised Premises (2) five per cent (5%) or more of the parking area in Tenant's Prime Parking Area, or (3) twenty per cent (20%) or more of the parking area of the Shopping Center as a whole shall be condemned or the Tenant's use thereof substantially restricted as specified above, or access to adjacent streets is materially altered and diminished without Tenant's approval (not to be unreasonably withheld, delayed or conditioned) and substantially similar substitute parking or reasonably similar space or access is not provided by Landlord, then Tenant shall have the right to terminate this Lease as of the date title thereto vests in the condemner by giving to Landlord written notice of such termination within 30 days after Tenant received notice of such condemnation; but should Tenant fail to timely terminate this Lease when such portion of the Demised Premises is so taken, this Lease shall terminate as to the part taken, and the rent and other relevant charges reserved herein shall be adjusted for the remainder of the Demised Premises so that Tenant shall be required to pay for the balance of the term that portion of the rent and other relevant charges reserved herein which the value of the portion of the Demised Premises remaining after condemnation bears to the value of the Demised Premises immediately prior to the date of condemnation. The rental and other charges shall be apportioned as aforesaid by agreement between the parties or by arbitration or legal proceedings, but pending such determination or adjudication, Tenant shall pay at the time and in the manner above provided the rental herein reserved, and all other charges herein required to be paid by Tenant, without deduction, and on such determination or legal adjudication, Tenant shall be entitled to credit for any excess rentals or other charges paid.

C. **GENERALLY.** It is recognized by both parties that the Landlord and Tenant each shall have separate rights of damage against the public authority on account of any condemnation or taking under the power of eminent domain of any part or all of said Demised Premises, and it is expressly provided herein that neither party waives or foregoes any claim it may have on behalf of its property or leasehold value; PROVIDED, HOWEVER, Tenant's rights to recover under this paragraph shall be subordinate to the rights of Landlord's first mortgagee.

16. **PERMITTED USE.** The Demised Premises may be used for any lawful retail purpose, provided that (i) Tenant shall not use or permit any person to use the Demised Premises or any part thereof for any purpose or use which would diminish the value of said property or which would be in violation of any applicable statute, ordinance, or governmental regulation, (ii) Tenant agrees to initially open and operate (for not less than one day) the Demised Premises as a "Hy-Vee" retail supermarket on or before April 1, 2004 (the "Outside Date"), (iii) Tenant shall not use or

14

permit or suffer the use of the Demised Premises for any business or purpose set forth as the Restrictions on Use on Exhibit G or the Exclusives set forth on Exhibit F, or (iv) Tenant's successors, assigns or subtenants shall not be permitted to change the use of the Demised Premises at any time during the term of this Lease to any use which would violate any then-existing exclusive or restriction set forth in any other lease in the Shopping Center provided the beneficiary of such exclusive or restriction is operating (or closed only temporarily due to repairs, remodeling or restocking). The parties agree that there shall be a day extension of the Outside Date for each day that the Possession Date occurs after April 1, 2003.

17. **COMPETITION TO TENANT.**

A. **SUPERMARKET.** Landlord, as further consideration for Tenant's entering into this Lease, agrees that as long as the Demised Premises are occupied by Tenant, its successors, or assigns for a retail supermarket, neither Landlord nor its subsidiaries, affiliates, successors, or assigns, or any entity in which they or any of them have an interest will demise, lease, sublease, use, or permit the use of any space in the Shopping Center for the purpose of (i) a retail food supermarket or (ii) the sale of grocery food items for consumption off the premises or (iii) a pharmacy or drug store with a licensed pharmacist.

B. **ADDITIONAL REMEDY FOR BREACH.** In the event Landlord breaches its covenants contained in this Section 17 and fails to cure the same within 30 days after receipt of written notice of such breach, then upon notice of such breach from Tenant (the "Exclusive Breach Notice"), base rent shall be automatically reduced to one-half (2) of stated amounts under Section 6 (or Section 5 as applicable) above until such breach has been cured, in which event the total amount of base rent so withheld shall be retained by Tenant as liquidated damages for any such breach and not as a penalty therefor, it being mutually agreed that Tenant will sustain damage from any such breach, the amount of which damage is impossible to ascertain even approximately. Tenant shall also be entitled to equitable relief for any such violation. Notwithstanding the foregoing provisions of this Section, if Landlord's breach of this Section is due to any tenant or occupant violating the restrictions set forth in this Section and such violation shall constitute a breach of a restriction in such tenant's own lease, or in any instrument to which such occupant is bound, then only if such breach has not been cured within 120 days after Tenant's delivery of the Exclusive Breach Notice, base rent shall be reduced to one-half (2) of stated base rent under Section 6 (or Section 5 as applicable) above until such breach has been cured. Notwithstanding anything to the contrary set forth in the Lease, if Tenant's restriction in this Section is held unenforceable in a final, non-appealable judgment by a court of competent jurisdiction, Tenant shall have no base rent reduction right with regard to this Section.

C. **EXCEPTION.** Notwithstanding anything to the contrary contained in this Section 17, it is agreed that there will be excepted from the restrictions contained in this Section 17: (i) the sale of grocery food items where the sale of such items is within the general area of the checkout counter(s) and is incidental to and remains an insubstantial part of the main business of such tenant, (ii) a bakery, ice cream parlor or frozen yogurt shop occupying less than 3300 square feet, (iii) any existing tenant, or (iv) a restaurant, pizza carry-out store, confectionery, coffee, juice or espresso bar, coffee shop, vending machines for the dispensing of candy, food items and

15

nonalcoholic beverages, snack bar facilities, hot dog shop, fast food facility, or submarine sandwich shop. In addition, it is agreed that the restrictions contained in this Section 17 shall not apply to sales of candy and food items by Gordmans, Inc. which consist of packaged candy, mints, beverage mixes, sauces, or snack items; boxed candies and/or cookies; and gift baskets, other gift sets and/or decorative items containing food stuffs.

18. **COVENANT AGAINST MECHANICS LIENS.** Tenant shall do all things necessary to prevent the filing of any mechanic's or other liens against the Demised Premises, or the interest of any mortgagees or holders of any deed of trust covering the Demised Premises, by reason of any work, labor, services performed or any materials supplied or claimed to have been performed or supplied to Tenant, or anyone holding the Demised Premises, or any part thereof, through or under Tenant. If any such lien shall at any time be filed, Tenant shall either cause the same to be vacated and canceled of record within thirty (30) days after the date of the filing thereof or, if Tenant in good faith determines that such lien should be contested, Tenant shall furnish such security by surety bond or otherwise as may be necessary or be prescribed by law to release the same as a lien against the real property and to prevent any foreclosure of such lien during the pendency of such contest. If Tenant shall fail to vacate or release such lien in the manner and within the time period aforesaid, then, in addition to any other right or remedy of Landlord resulting from Tenant's said default, Landlord may, but shall not be obligated to, vacate or release the same either by paying the amount claimed to be due or by procuring the release of such lien by giving security, or in such other manner as may be prescribed by law. Tenant shall repay to Landlord, on demand, all sums disbursed or deposited by Landlord pursuant to the foregoing provisions of this paragraph, including Landlord's cost and expenses and reasonable attorney's fees incurred in connection therewith. However, nothing contained herein shall imply any consent or agreement on the part of the Landlord or any ground or underlying landlords or mortgagees or holders of deeds of trust of the Demised Premises to subject their respective estates or interest to liability under any mechanic's or other lien law, whether or not the performance or the furnishing of such work, labor, services, or materials to Tenant or anyone holding the Demised Premises, or any part thereof, through or under Tenant, shall have been consented to by Landlord and/or any of such parties.

19. **FIXTURES AND MACHINERY.** It is mutually agreed that all personal property on the Demised Premises, including merchandise of every kind, nature, and description, furnishings, equipment, trade fixtures, and including refrigeration equipment (but expressly excluding air conditioning equipment and heating equipment), and all other property hereafter placed or kept on the Demised Premises by Tenant at Tenant's expense, are and shall continue to be the sole property of the Tenant, unless the same shall have been installed to replace equipment previously installed by Landlord. Tenant may, during the term of this Lease or any extensions thereof, remove any such furniture, fixtures, or equipment as it may so desire provided Tenant shall repair all damages resulting from such removal or installation, as nothing in this Section is intended to impose any restrictions on the use of the such furniture, fixtures, or equipment as the Tenant may deem necessary or desirable in the operation of its business.

20. **QUIET ENJOYMENT.** Landlord covenants that Landlord is the sole owner in fee simple of the Demised Premises, has good and marketable title thereto, and has full right to lease the Demised Premises for the term aforesaid, and for the term of all extensions permitted to the

16

Tenant hereunder, and that Tenant upon payment of rent and performing Tenant's obligations in this Lease may peaceably and quietly have, hold, and enjoy the said Demised Premises for the said term and all extensions thereof until terminated as provided in this Lease without any interruption from Landlord or any person or persons lawfully claiming the Demised Premises by through or under Landlord.

21. **SUBORDINATION.** Landlord may assign its rights under this Lease as security to the holders of one or more mortgages (which term shall include a mortgage, trust deed, or other encumbrance) now or hereafter in force against all or any part of the land or improvements constituting the Demised Premises or the Shopping Center. Upon the request of Landlord, Tenant will subordinate its rights hereunder to the lien of one or more mortgages (which term shall include a mortgage, trust deed, or other encumbrance) now or hereafter in force against all or any part of the land and improvements constituting the Demised Premises or the Shopping Center, and to all advances made or hereafter to be made upon the security thereof; PROVIDED, HOWEVER, that any such subordination shall provide that the mortgagee, in the event of its acquiring title to the Demised Premises or the Shopping Center, whether through foreclosure, judicial process or otherwise, shall recognize the validity of this Lease and shall honor the rights of Tenant hereunder so long as Tenant (a) is not in default under this Lease at the time such mortgagee acquires title to the Demised Premises or the Shopping Center and (b) agrees to attorn to such mortgagee as if it were the original Landlord hereunder. Without limiting the foregoing, Landlord and Tenant agree to utilize the Subordination Non-Disturbance and Attornment Agreement (the "SNDA") attached hereto as Exhibit "C", subject only to such modifications as Lender may reasonably require. The parties agree that in the event Landlord fails to obtain an SNDA executed by Lender on or before January 1, 2003, Tenant shall have the right to terminate this Lease by giving Landlord written notice of such termination prior to the earlier of (i) January 31, 2003 or (ii) the date Landlord delivers such executed SNDA to Tenant.

22. **DEFAULT.**

A. **TENANT'S DEFAULT.** If any rent, additional charges or other sums due and payable to Landlord under this Lease shall be unpaid on the date payment of such sum is required hereunder and such payment remains unpaid for a period of ten (10) days after written notice of such default has been given by Landlord to Tenant, or if Tenant shall default in the performance of any covenants, agreements, stipulations, or other conditions contained herein (other than the payment of rent or other sums payable under this Lease) and such default continues for a period of thirty (30) days after written notice of such violation or default has been given by Landlord to Tenant or, in the case of a default not curable within thirty (30) days, if Tenant shall fail to commence to cure the same within thirty (30) days and thereafter proceed diligently to complete the cure thereof, or if Tenant shall suffer this Lease to be taken under any writ of execution, attachment or other process of law, or if this Lease shall by operation of law devolve upon or pass to any other party other than a party, if any, to whom Tenant is authorized to assign this Lease by the provisions of Section 13, or if Tenant shall fail to open the Demised Premises for business with the public fully fixtured, stocked and staffed by the Outside Date, then Landlord shall have, besides its other rights or remedies at law or in equity, the following immediate rights:

17

(1)     If Tenant shall have abandoned the Demised Premises, at its option, without terminating this Lease, to change the locks on the doors to the Demised Premises and exclude Tenant therefrom.

(2)     At its option, by notice to Tenant, to terminate this Lease. Upon the service of such notice of termination, the term shall automatically terminate.

(3)     At its option, by notice to Tenant, to terminate Tenant's right to possession of the Demised Premises without termination of this Lease.

(4)     Upon (i) any termination of this Lease, whether by lapse of time or by the exercise of any option by Landlord to terminate the same or in any other manner whatsoever, or (ii) any termination of Tenant's right to possession without termination of this Lease, Tenant shall immediately surrender possession of the Demised Premises to Landlord and immediately vacate the same, and remove all effects therefrom, except such as may not be removed under other provisions of this Lease. If Tenant fails to surrender possession and vacate as aforesaid, Landlord may forthwith re-enter the Demised Premises, and repossess itself thereof as in its former estate and expel and remove Tenant and any other persons and property therefrom, using such force as may be necessary, without being deemed guilty of trespass, eviction, conversion or forcible entry and without thereby waiving Landlord's rights to rent or any other rights given Landlord under this Lease or at law or in equity. If Tenant shall not remove all effects from the Demised Premises as hereinabove provided, Landlord may, at its option, remove any or all of such effects in any manner it shall choose and store the same without liability for loss thereof, and Tenant shall pay Landlord, on demand, any and all expenses incurred in such removal and also storage of such effects for any length of time during which the same shall be in Landlord's possession or in storage. No re-entry or taking possession of the Demised Premises by Landlord, as provided in clauses (1) and (3) of this paragraph, shall be construed as an election on its part to terminate this Lease unless a notice of such intention is given to Tenant (all other demands and notices of forfeiture or other similar notices being hereby expressly waived by Tenant). Notwithstanding any reletting without termination, Landlord may at any time thereafter elect to terminate this Lease for such previous breach in the manner provided in this Section.

(5)     At its option, to make such alterations and repairs as Landlord shall determine may be reasonably necessary to relet the Demised Premises, and to relet the same or any part thereof for such term or terms (which may be for a term extending beyond the term) and upon such terms and conditions as Landlord in its sole discretion may deem advisable. Upon each reletting, all rentals received by Landlord from such reletting shall be applied as follows: first, to the payment of any indebtedness other than rent or other charges due under this Lease from Tenant to Landlord; second, to the payment of any costs and expenses of such reletting, including brokerage fees and attorneys' fees and costs of such alterations and repairs, each of which fees and costs shall be reasonable in amount; and third, to the payment of rent and other charges due and unpaid hereunder. In no event shall Tenant be entitled to receive any surplus of any sums received by Landlord on a reletting in

18

excess of the rental and other charges payable hereunder. If such rentals and other charges received from such reletting during any month are less than those to be paid during that month by Tenant hereunder, Tenant shall pay any such deficiency to Landlord (notwithstanding the fact that Landlord may have received rental in excess of the rental and other charges payable hereunder in previous or subsequent months), such deficiency to be calculated and payable monthly.

(6)     At its option, to collect from Tenant any other loss or damage which Landlord may sustain by reason of any breach and any diminished value of the Demised Premises resulting from such breach.

(B)     Upon a breach or threatened breach by Tenant of any of the covenants or provisions of this Lease, Landlord shall have the right to seek and obtain immediate injunctive relief for any such breach or threatened breach.

(C)     No receipt of moneys by Landlord from or for the account of Tenant or from anyone in possession or occupancy of the Demised Premises after the termination in any way of this Lease or after the giving of any notice of termination, shall reinstate, continue or extend the term or affect any notice given to Tenant prior to the receipt of such money, it being agreed that after the service of notice or the commencement of a suit, or after final judgment for possession of the Demised Premises, Landlord may receive and collect any rent or other amounts due Landlord, and such payment shall not waive or affect such notice, suit or judgment.

B.     **LANDLORD'S DEFAULT.** If Landlord shall default in the performance of any obligation of Landlord under the Lease and such default shall continue for thirty (30) days after receipt by Landlord of written notice thereof given by Tenant or, in the case of a default not curable within thirty (30) days, if Landlord shall fail to commence to cure the same within thirty (30) days and thereafter proceed diligently to complete the cure thereof, then Tenant, at its option, may perform such term, covenant, or condition, or make good such default, and any amount advanced shall be repaid forthwith on demand, together with interest at the Default Rate from date of advance. Tenant shall have all other remedies, at law or in equity, available to Tenant in Missouri.

23.     **WAIVER OF SUBROGATION.** Neither Landlord nor rights as Tenant shall be liable to the other for any business interruption or any loss or damage to property or injury or death of persons occurring on the Demised Premises or Tenant's Prime Parking Area (unless Landlord has exercised Landlord's Takeover Right) or in any manner growing out of Tenant's use of the Demised Premises or Tenant's Prime Parking Area (unless Landlord has exercised Landlord's Takeover Right), whether or not caused by the fault or negligence of the Landlord or Tenant, or their respective agents, employees, subtenants, licensees, or assignees. This release shall apply only to the extent that such business interruption, loss or damage to property, or injury or death of persons is covered by insurance, and to the extent that recovery is made of proceeds thereunder, and regardless of whether such insurance protects the Landlord or Tenant or both. Nothing herein shall be construed to impose any other or greater liability upon either of the parties to this Lease than would have existed in the absence of this paragraph. This paragraph shall be effective only so long

19

as its provisions do not adversely affect the right of the insured, whether Landlord or Tenant or both, to recover under the applicable policy or policies of insurance, and if prohibited under the terms of such policy or policies, shall be deemed wholly without force or effect.

24. **ESTOPPEL CERTIFICATES.** Tenant, from time to time and within 10 business days after written request from Landlord, agrees to execute, acknowledge, and deliver to Landlord, in substantially the form and substance as set forth in Exhibit "D" attached hereto but subject to such modifications as Lender may reasonably require, a written statement certifying that Tenant has accepted the Demised Premises, that this Lease is unmodified and in full force and effect (or, if there have been modifications, that this Lease is in full force and effect as modified, setting forth the modifications), that Landlord is not in default hereunder, the date to which the rent and other amounts payable by Tenant have been paid in advance, if any, and such additional facts as reasonably may be required by Landlord or Landlord's mortgagee. Tenant understands and agrees that any such statement delivered pursuant to this paragraph may be relied upon by any prospective purchaser of the Demised Premises, any prospective mortgagee of the Demised Premises, and their respective successors and assigns.

25. **SURRENDER OF PREMISES AT END OF TERM.** Tenant agrees that upon the termination of this Lease it will surrender, yield up, and deliver the Demised Premises in good and clean order, condition and repair, except the effects of reasonable wear and tear from the last necessary repair and replacement of the Demised Premises, free and clear of all liens and encumbrances. Tenant shall remove its inventory, equipment, furniture, and trade fixtures; and any personal property or fixtures not so removed shall, at Landlord's option, be presumed to be abandoned and shall thereupon be the property of Landlord. Nothing herein is to be construed to require that Tenant remove any property which has become a fixture of the Demised Premises.

26. **PARAGRAPH TITLES.** The titles of the various paragraphs of this Lease have been inserted merely as a matter of convenience and for reference only, and shall not be deemed in any manner to define, limit, or describe the scope or intent of the particular paragraphs to which they refer or to affect the meaning or construction of the language contained in the body of such paragraphs.

27. **SEVERABILITY.** If any provision of this Lease shall be declared legally invalid or unenforceable, then the remaining provisions of this Lease nevertheless shall continue in full force and effect and shall be enforceable to the fullest extent permitted by law.

28. **TIME OF ESSENCE.** Time is of the essence of this Lease, and all provisions of this Lease relating to the time of performance of any obligation under this Lease shall be strictly construed.

29. **GOVERNING LAW.** This Lease shall be governed by and construed in accordance with the laws of the state of Missouri.

20

30. **MULTIPLE COUNTERPARTS.** This Lease may be executed in multiple counterparts, each of which shall be deemed to be an original for all purposes.

31. **DEFINITIONS.** Except as otherwise expressly stated in this Lease, the "term" of this Lease shall include the original term and any additional term as to which Tenant exercises its options, if any, and references to this "lease" shall include this instrument and any properly executed amendment thereof or supplement thereto.

32. **WAIVERS.** One or more waivers by Landlord or Tenant of a breach of any covenant or condition by the other of them shall not be construed as a waiver of the subsequent breach of the same covenant or condition, and the consent or approval by Landlord or Tenant to or of any act by either requiring the other's consent or approval shall not be deemed to waive or render unnecessary either party's consent to or approval of any subsequent similar act by the other party. No covenant, term or condition of this Lease shall be deemed to have been waived unless such waiver be in writing signed by the party charged therewith.

33. **BINDING AGREEMENT.** All rights and liabilities herein given to or imposed upon the respective parties hereto shall extend to and bind the respective heirs, executors, administrators, personal representatives, successors, and assigns of such parties. No rights, however, shall inure to the benefit of any assigns of Tenant unless the assignment thereof to such assignee has been approved by Landlord in writing, if such approval is required by this Lease.

34. **SHORT FORM LEASE.** Both parties agree not to record this Lease; but each party hereto agrees at the request of the other to execute a so-called "short form" of this Lease in form recordable and reasonably satisfactory to both parties' attorneys. In no event shall such "short form" lease set forth the rental and other charges payable by Tenant under this Lease, and any such "short form" lease shall expressly state that it is executed pursuant to the provisions contained in this Lease and is not intended to vary the terms and conditions of this Lease. If at the time of recording and/or filing of said short form lease the Demised Premises or any part thereof shall be subject to any trust deed or mortgage, Landlord's title shall not be deemed defective if Landlord shall promptly obtain an agreement in a form reasonably satisfactory to Tenant from the holder or holders of the note or notes secured by such trust deed or mortgage obligating any party acquiring title or the right of possession under or by virtue of such trust deed or mortgage to be bound by this Lease, provided Tenant is not in default hereunder, which agreement shall be recorded and/or filed in the same place or places as said short form lease. Upon completion of the recording and/or filing of such short form lease and agreement, if any, they shall be delivered to Tenant, and if necessary such recordings and/or filings shall be made in duplicate so that recorded and/or filed counterparts thereof may be so delivered to Tenant.

35. **RELATIONSHIP OF PARTIES.** Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third party to create the relationship of principal and agent or of partnership or of joint venture between the parties hereto, it being understood and agreed that neither the method of computation of rent, nor any other provision contained herein, nor any acts of the parties hereto shall be deemed to create any relationship between the parties hereto

21

with a copy to:           Lewis, Rice and Fingersh, L.C.
                             1010 Walnut, Suite 500
                             Kansas City, Missouri 64106
                             Attention:     Paul B. Torline, Esq.
                             816-472-2500 (facsimile number)

C.      If any Notice is sent by facsimile, the transmitting party shall send a duplicate copy of the Notice to the other party by regular mail. In all events. However, any Notice sent by facsimile transmission shall govern all matters dealing with delivery of Notice, including the date on which the Notice is deemed to have been received by the other party.

D.      The provisions above governing the date on which a Notice is deemed to have been received by a party shall mean and refer to the date on which a party, and not its counsel or other recipient to which a copy of the Notice may be sent, is deemed to have received the Notice.

E.      If Notice is tendered under the provisions of this paragraph and is refused by the intended recipient of the Notice, the Notice shall nonetheless be considered to have been given and shall be effective as of the date provided in this section.

37.     **DELAYS IN PERFORMANCE.** The performance by Landlord and Tenant of any of their respective obligations or undertakings provided for in this Lease (except (i) the payment of rent or any other sums of money payable by Tenant under this Lease or (ii) any delays resulting from the inability of a party to obtain financing or to proceed with its obligations under this Lease because of lack of funds) shall be excused for the period of delay and the period of performance of such act shall be extended for a period equivalent to the period of such delay, and no default shall be deemed to exist in the event and so long as the performance of any such obligation or undertaking is prevented, delayed, retarded, or hindered by any act of God, fire, earthquake, flood, explosion, action of the elements, war, riot, failure of transportation, strikes, lockouts, action of labor unions, condemnation, laws, orders of government or civil or military authorities, inability to procure labor, equipment, materials, or supplies in the open market, or any other cause directly beyond the control of Landlord or Tenant, as the case may be.

38.     **INDEMNIFICATION.**

(A)     Tenant will, subject to the provisions of Section 23, indemnify, save harmless and defend Landlord and its officers, agents and servants, from and against any and all claims, actions, liability and expense in connection with loss of life, bodily injury and/or damage to property arising from or out of any occurrence in, upon or at the Demised Premises or the Tenant's Prime Parking Area, or the occupancy or use by Tenant, its agents, employees, servants, subtenants, licensees or concessionaires, of the Demised Premises, the Tenant's Prime Parking Area, or any part thereof, unless the same be caused by the willful or negligent act or omission of Landlord, its agents, employees or servants, and/or outside the Demised Premises and the Tenant's Prime Parking Area which is occasioned wholly or in part by any willful or negligent act or omission of Tenant, its agents, employees, servants, subtenants, licensees or concessionaires.

23

(B)     Landlord will, subject to the provisions of Section 23, indemnify, save harmless and defend Tenant, its officers, agents and servants, from and against any and all claims, actions, suits, judgments, decrees, orders, liability and expense in connection with loss of life, bodily injury and/or damage to property arising from or out of any occurrence in, at or upon the Demised Premises which is occasioned wholly or in part by any willful or negligent act or omission of Landlord, its agents, employees, or servants; and/or in or upon any of the Common Areas of the Shopping Center or any part thereof (excepting therefrom, the Tenant's Prime Parking Area), unless the same be caused by the willful or negligent act or omission of Tenant, its agents, employees, servants, subtenants, licensees or concessionaires.

39.     **CUMULATIVE RIGHTS.**  The rights, options, elections, and remedies of both parties contained in this Lease shall be cumulative and may be exercised on one or more occasions; and none of them shall be construed as excluding any other or any additional right, priority, or remedy allowed or provided by law.

40.     **HOLDOVER.**  In the event that Tenant remains in possession of the Demised Premises after the termination of this Lease without the exercise of an option (if any exist) to extend the term of this Lease or without the execution of a new lease, then Tenant shall be deemed to be occupying the Demised Premises as a tenant from month to month at 150% of the monthly base rent payable for the last year of this Lease, subject to all of the conditions, provisions, and obligations of this Lease insofar as the same are applicable to a month to month tenancy, but without any rights to extend the term of this Lease.

41.     **DELINQUENT PAYMENTS.**  If any rent or other sums due and payable by Tenant under this Lease are not paid within ten (10) days after such rent or other sums are due and payable, then such unpaid rent or other sums shall bear interest from their respective due dates until paid at a rate (the "Default Rate") which is the lesser of (i) the highest lawful rate that may be charged Tenant by Landlord or (ii) three percent (3%) (which is the equivalent of 300 basis points) in excess of the publicly announced base commercial lending rate of Citibank, N.A. or its successors from time to time in effect; PROVIDED, HOWEVER, if Citibank, N.A. or its successors shall cease to exist, then the base commercial lending rate of the then largest bank (in amount of assets) in the United States shall be used.

42.     **ENTRY BY LANDLORD.**  Landlord shall have the right to enter upon the Demised Premises at all reasonable hours for the purpose of inspecting the Demised Premises or for any other lawful purpose; PROVIDED, HOWEVER, that such entry shall not unreasonably interfere with the conduct of Tenant's business.  For a period of 180 days prior to the termination of this Lease, Landlord may have reasonable access to the Demised Premises for the purpose of exhibiting the Demised Premises to prospective tenants thereof and may display "For Rent" signs on the Demised Premises.

43.     **EXECUTION REQUIRED.**  The submission of this document for examination does not constitute an offer to lease, or a reservation of or option for the Demised Premises and shall become effective only upon execution by both Tenant and Landlord.

24

44. **NUMBER AND GENDER.** Where the context of this Lease requires, singular words shall be read as if plural, plural words shall be read as if singular, and words of neuter gender shall be read as if masculine or feminine.

45. **ENTIRE AGREEMENT.** Tenant and Landlord hereby agree that this Lease as written represents the entire agreement between the parties hereto and that there are no other agreements, written or verbal, between the parties hereto pertaining to the Demised Premises or the subject matter hereof. This Lease may not be amended or supplemented orally but only by an agreement in writing which has been signed by the party against whom enforcement of any such amendment or supplement is sought.

46. **LOCAL REGULATIONS.** Tenant shall, at Tenant's sole cost, comply with all of the laws, rules, regulations and requirements of all governmental authorities (including environmental, civil rights, handicapped and those requiring replacements, additions, repairs and alterations [structural or otherwise]), and with all directions, rules, regulations and recommendations of Tenant's property insurer, now in force, or which may hereafter be in force, pertaining to the Demised Premises and the use and occupancy thereof. The Tenant will supply any apparatus, appliance, or material and will have done any work for, in, or about the Demised Premises which may be required or ordered by any law or lawful authority.

47. **INTENTIONALLY OMITTED.**

48. **CORPORATE LANDLORD.** The persons executing this Lease on behalf of Landlord hereby covenant, represent, and warrant that Landlord is duly incorporated under the laws of the State of Missouri and that the person(s) executing this Lease on behalf of Landlord is an officer or are officers of such Landlord, and that he or they as such officer(s) is/are duly authorized to sign and execute this Lease.

49. **CORPORATE TENANT.** The persons executing this Lease on behalf of Tenant hereby covenant, represent, and warrant that Tenant is duly incorporated under the laws of the State of Iowa and that the person(s) executing this Lease on behalf of Tenant is an officer or are officers of such Tenant, and that he or they as such officer(s) is/are duly authorized to sign and execute this Lease.

50. **BROKER'S COMMISSIONS.** Tenant and Landlord each represent and warrant to the other that no broker or finder has acted on its behalf in connection with this Lease or the transactions contemplated hereby except for RH Johnson & Company ("Tenant's Broker") and Cohen Esrey Real Estate Services, Inc. ("Landlord's Broker"). Landlord shall be responsible for all fees or commissions due to Landlord's Broker pursuant to a separate agreement between Landlord and Landlord's Broker and Landlord's Broker agrees to split such commission with Tenant's Broker. Each party agrees to indemnify and hold and save harmless the other from any claim or demand for commissions or other compensation by any broker, finder or similar agent claiming to have been employed by or on behalf of such party.

25

51. **ATTORNEY-IN-FACT.** Landlord hereby appoints Tenant Landlord's lawful attorney-in-fact in Landlord's name to apply for and secure from any governmental authority having jurisdiction thereover any permit or license which may be necessary in connection with any alteration, addition, or repair to the Demised Premises.

52. **CONSENT.** In any instance where the consent or approval of either party is required under the terms of this Lease, such consent or approval shall be unreasonably withheld, conditioned or delayed. Landlord and Tenant agree to execute and deliver any instruments in writing necessary to carry out any agreement, term, condition, or assurance in the Lease whenever occasion shall arise and request for such instruments shall be made.

53. **TENANT'S OPERATIONS.** Tenant shall, subject to the provisions of Section 37, open the Demised Premises as a "Hy-Vee" retail supermarket by the Outside Date. If Tenant shall fail to continuously operate at least 25,000 or more square feet in the Demised Premises as a single store for longer than 720 days, then Landlord may, at its option, at any time within 180 days after the expiration of such 720 day period, elect to terminate this Lease by notice to Tenant, and if Landlord so elects (i) this Lease shall terminate effective as of the date ("Termination Date") which is 30 days after the date of Landlord's termination notice, (ii) Tenant shall surrender possession of the Demised Premises to Landlord on the Termination Date in the condition required by Section 25, (iii) the Rent shall be adjusted as of the Termination Date, and (iv) neither party shall have any further rights of obligations under this Lease thereafter, except those obligations which are intended to survive such termination; PROVIDED, HOWEVER, nothing set forth in this Section shall be construed to relieve Tenant of continuing liability if an Event of Default shall exist as of the Termination Date. In the event Landlord exercises the foregoing termination right, Landlord, upon the Termination Date, shall also pay to Tenant the unamortized cost (based upon a 20 year straight line amortization schedule) of Tenant's structural additions (specifically excluding, without limitation, any fixtures, furniture or equipment) to the Demised Premises. In the event Landlord fails to exercise the foregoing termination right during such 180-day period, then Landlord shall have no further right to terminate this Lease pursuant to this Section 53.

54. **ATTORNEYS' FEES.** In any action between Landlord and Tenant to enforce the terms of this Agreement, the prevailing party shall be reimbursed by the other party for all reasonable fees and expenses, including attorneys' fees and court costs, incurred by it in connection with the prosecution or defense of such action.

55. **AMERICANS WITH DISABILITIES ACT.**

A. **TENANT.** Notwithstanding anything herein to the contrary, Tenant shall be obligated to, and have the responsibility of complying with all of the relevant terms, conditions and requirements of the Americans with Disabilities Act (the "ADA") to the extent the ADA is applicable to Tenant's use and occupancy of the Demised Premises or Tenant's Prime Parking Area (unless Landlord has exercised "Landlord's Takeback Right"). To the extent the provisions of the ADA mandate modifications to the Demised Premises or Tenant's Prime Parking Area (unless Landlord has exercised "Landlord's Takeback Right"), such modifications shall be made by Tenant at its sole cost and expense, but in coordination and consultation with Landlord. In the event

Tenant shall fail to comply with the requirements of the ADA, Landlord may, but shall not be obligated, take such steps as may be necessary to comply with the ADA and Tenant shall pay Landlord, upon demand, the cost thereof, plus interest at the Default Rate.

B. **LANDLORD**. Notwithstanding anything herein to the contrary, Landlord shall have the responsibility of complying with all of the relevant terms, conditions and requirements of the Americans with Disabilities Act (the "ADA") to the extent the ADA is applicable to the Shopping Center other than the Demised Premises or Tenant's Prime Parking Area (unless Landlord has exercised "Landlord's Takeback Right"). To the extent the provisions of the ADA mandate and modifications to the Shopping Center (other than the Demised Premises and Tenant's Prime Parking Area (unless Landlord has exercised "Landlord's Takeback Right")), such modifications shall be made by Landlord at its sole cost and expense.

56. **JURY TRIAL; SURVIVAL**. To the extent permitted by applicable law, and acknowledging that the consequences of said waiver are fully understood, each party hereby expressly waives the right to trial by jury in any action taken with respect to this Lease. Notwithstanding anything in this Lease to the contrary, the representations and undertakings of each party under this Lease shall survive the expiration or termination of this Lease regardless of the means of such expiration or termination.

57. **HAZARDOUS SUBSTANCES.**

A. **TENANT.** Tenant covenants and warrants that Tenant's Work and any alterations thereto and Tenant's use of Demised Premises and Tenant's Prime Parking Area will at all times comply with and conform to all laws, statutes, ordinances, rules and regulations of any governmental, quasi-governmental or regulatory authorities ("Laws") which relate to the transportation, storage, placement handling, treatment, discharge, generation, production or disposal (collectively "Treatment") of any waste, petroleum product, waste products, radioactive waste, polychlorinated biphenyls, asbestos, hazardous materials of any kind, and any substance which is regulated by any law, statute ordinance, rule or regulation (collectively "Waste"). Tenant further covenants and warrants that it will not engage in or permit any person or entity to engage in any Treatment of any Waste on or which affects the Shopping Center.

Immediately upon receipt of any Notice (as hereinafter defined) from any person or entity, Tenant shall deliver to Landlord a true, correct and complete copy of any written Notice. "Notice" shall mean any note, notice or report of any suit, proceeding, investigation, order, consent order, injunction, writ, award or action related to or affecting or indicating the Treatment of any Waste in or affecting the Demised Premises or Tenant's Prime Parking Area.

Tenant hereby agrees it will indemnify, defend, save and hold harmless Landlord and Landlord's officers, directors, shareholders, employees, agents, partners, and their respective heirs, successors and assigns (collectively "Landlord's Indemnified Parties") against and from, and to reimburse the Landlord's Indemnified Parties with respect to any and all damages, claims, liabilities, loss, costs and expense (including, without limitation, all attorneys' fees and expenses, court costs, administrative costs and costs of appeals), incurred by or asserted against the Landlord's

Indemnified Parties by reason of or arising out of: (a) the breach of any representation or undertaking of Tenant under this Subsection 57A, or (b) arising out of the Treatment of any Waste by Tenant or any licensee, concessionaire, manager or other party occupying or using the Demised Premises, in or affecting the Shopping Center.

Landlord is given the right, but not the obligation, to inspect and monitor the Demised Premises and Tenant's use of the Demised Premises in order to confirm Tenant's compliance with the terms of this Subsection 57A and the representations set forth in this Subsection 57A.

Tenant agrees to deliver upon request from Landlord estoppel certificates to Landlord expressly stipulating whether Tenant is engaged in or has engaged in the Treatment of any Waste in or affecting the Demised Premises or the Shopping Center, and whether Tenant has caused any spill, contamination, discharge, leakage, release or escape of any Waste in or affecting the Demised Premises or the Shopping Center, whether sudden or gradual, accidental or anticipated, or any other nature at or affecting the Demised Premises or the Shopping Center and whether, to the best of the Tenant=s knowledge, such an occurrence has otherwise occurred at or is affecting the Demised Premises or the Shopping Center.

B.    **LANDLORD.**   Landlord covenants and warrants that any alterations to the Shopping Center performed by Landlord will at all times comply with and conform to all Laws which relate to the Treatment of any Waste.  Landlord further covenants and warrants that it will not engage in any Treatment of any Waste on or which affects the Shopping Center, including the Demised Premises.

Immediately upon receipt of any Notice from any person or entity, Landlord shall deliver to Tenant a true, correct and complete copy of any written Notice.

Landlord hereby agrees it will indemnify, defend, save and hold harmless Tenant and Tenant's officers, directors, shareholders, employees, agents, partners, and their respective heirs, successors and assigns (collectively "Tenant's Indemnified Parties") against and from, and to reimburse Tenant's Indemnified Parties with respect to any and all damages, claims, liabilities, loss, costs and expense (including, without limitation, all attorneys' fees and expenses, court costs, administrative costs and costs of appeals), incurred by or asserted against Tenant's Indemnified Parties by reason of or arising out of: (a) the breach of any representation or undertaking of Landlord under this Subsection 57B, or (b) arising out of the Treatment of any Waste by Landlord in or affecting the Shopping Center, including the Demised Premises.

58.    **ACCORD AND SATISFACTION.** No payment by Tenant or receipt by Landlord of a lesser amount than the monthly rent and other charges herein reserved shall be deemed to be other than on account of the earliest stipulated rent or other charges, nor shall any endorsement or statement on any check or on any letter accompanying any check be deemed an accord and satisfaction.

59. **LIMITATIONS ON LIABILITY.**

(A)    Notwithstanding anything to the contrary contained in this Lease, Tenant agrees that Tenant shall look solely to the estate of Landlord in the Shopping Center for the collection of any judgment (or other judicial process) requiring the payment of money by Landlord upon any default or breach by Landlord with respect to any of the terms and provisions of this Lease to be observed or performed by Landlord, subject, however, to the prior rights of the holder of any mortgage covering the Shopping Center, and no other assets of Landlord shall be subject to levy, execution or other judicial process for the satisfaction of Tenant's claim, and Landlord shall not be liable for any such default or breach except to the extent of Landlord's estate in the Shopping Center.

(B)    Notwithstanding anything to the contrary contained in this Lease, if Landlord shall elect to provide security service to the Shopping Center other than the Demised Premises, then (i) any security service that may be provided by Landlord is intended solely for the protection and benefit of the Common Facilities and not for the protection or benefit of the Demised Premises or the any other Tract; and (ii) Landlord shall not be liable in any manner whatsoever to Tenant or to any third party by reason of Landlord's act or failure to act in providing or maintaining security in the Shopping Center.  If Landlord shall elect to provide security service to the Demised Premises, such security service must be competent and the price therefor must be competitive.  Any such contract by Landlord shall include a provision that Tenant shall retain all rights against the provider of such service as if Tenant were a party to such contract.

60. **WASTE OR NUISANCE.**

(A)    Tenant shall not commit or suffer to be committed (i) any waste in or upon the Demised Premises or Tenant's Prime Parking Area; (ii) any nuisance or any other act or thing (whether a nuisance or otherwise) which may disturb the quiet enjoyment of any other tenant or occupant in the Shopping Center or its customers or other invitees; or (iii) any unlawful purpose or use in violation of any law or ordinance or regulation of any governmental authority.

(B)    Landlord shall not commit (i) any waste in or upon the Demised Premises or Tenant's Prime Parking Area; (ii) any nuisance or any other act or thing (whether a nuisance or otherwise) which may disturb the quiet enjoyment of any other tenant or occupant in the Shopping Center or its customers or other invitees; or (iii) any unlawful purpose or use in violation of any law or ordinance or regulation of any governmental authority.

61.    **RULES AND REGULATIONS.** Tenant agrees to comply with and observe the rules and regulations attached hereto as Exhibit "I".  Landlord reserves the right, at any time, once or more often, by notice to Tenant, to amend or supplement such rules and regulations in a reasonable and non-discriminatory manner.

62.    **STORAGE; OFFICE SPACE.** Tenant shall store in the Demised Premises only such merchandise as Tenant intends to offer for sale at retail therein within a reasonable time after receipt thereof, but this shall not preclude occasional transfers of merchandise to the other stores of

29

Tenant or its affiliates not located in the Shopping Center. Tenant shall use for office, clerical and other non-selling purposes only such space in the Demised Premises as is from time to time reasonably required for Tenant's retail business therein.

IN WITNESS WHEREOF, the parties hereto have set their hands the date and year first above written.

LANDLORD:

J.A. PETERSON ENTERPRISES, INC.

By _____
       Kenneth L. Riedemann
       President

TENANT:

HY-VEE, INC.

By _____
       Ronald D. Pearson, Chief
       Executive Officer and Chairman

By _____
       James D. Meyer,
       Assistant Secretary

f:\lrf\pbt\peterson\creekwd\hy-vee\lease-7.2.doc

Case 4:22-cv-00192-BP   Document 1-1   Filed 03/22/22   Page 29 of 54

# EXHIBIT "A"

[legal description]

PARCEL 1:
Tract 1, CREEKWOOD OAKS THIRD PLAT, a subdivision in Kansas City, Clay County, Missouri, according to the recorded plat thereof, filed in Plat Book 24, Pages 104 and 105.

Together with the easements appurtenant to the above parcel of land.

PARCEL 2:
All of CREEKWOOD, a subdivision in Gladstone, Clay County, Missouri, according to the recorded plat thereof, filed in Plat Book 24 at Page 34.

PARCEL3:
The Leasehold Estate created by and between Kansas City, Missouri, Lessor, and North Oak Retail Partnership, Lessee, dated March 30, 1988, notice of which is given by Memorandum of Lease recorded July 8, 1988, as Document No. G-12226, in Book 1853, Page 107, leasing the following described property:

All of North 130 feet of East 165.0 feet of the Northeast Quarter of the Northwest Quarter of Section 35, Township 51, Range 33, in Kansas City Clay County, Missouri, except that part thereof in North Oak Trafficway, and Except that part thereof in N.E. Englewood Road (now platted as Tract 2, CREEKWOOD OAKS THIRD PLAT, a subdivision of land in Kansas City, Clay County, Missouri).

31

## EXHIBIT "B"

[Site Plan]

- Shopping Center - outlined in blue
- Demised Premises - hatched
-Tenant's Prime Parking Area - outlined in green
-    Outparcel One and Outparcel Two, outlined in red

[See Attached]

32

<u>EXHIBIT "C"</u>

<u>SUBORDINATION (NONDISTURBANCE)</u>
<u>AND ATTORNMENT AGREEMENT</u>

**THIS AGREEMENT,** made this _____ day of _____, 20__, by and between __Security Life of Denver Insurance Company__, a national banking association, having its principal place of business and post office address at c/o ING Investment Management LLC, 5780 Powers Ferry road, NW, Suite 300, Atlanta, GA 30327-4349, Attn: Real Estate Legal Department_____, hereinafter referred to as "Mortgagee", and Hy-Vee, Inc., an Iowa corporation, having its principal place of business and post office address as 5820 Westown Parkway, West Des Moines, Iowa 50266, hereinafter referred to as "Tenant",

**WITNESSETH:**

**WHEREAS,** the Mortgagee is the holder of the _____ _____, hereinafter collectively called the "Mortgage", dated _____, made by _____, as mortgagor, in favor of Mortgagee, as Mortgagee, filed in the office of the _____ County Recorder on the ___ day of _____, _____, in Book _____ at pages _____-_____; and

**WHEREAS,** the Mortgage covers the premises described in <u>Exhibit "A"</u>, hereunto attached; and

**WHEREAS,** the Tenant has executed and delivered a lease, hereinafter referred to as the "Lease", covering said premises, which Lease is dated _____; and

**WHEREAS,** the Mortgagee and the Tenant have requested of and granted to each other the agreements hereinafter stated and desire to evidence said agreements in writing;

**NOW, THEREFORE,** for good and valuable consideration paid by each to the other, the receipt and sufficiency of which is hereby acknowledged, the Mortgagee and the Tenant agree as follows:

33

1.	**Subordination.**  The Lease is hereby and shall at all times hereafter continue to be subject and subordinate in each and every respect to the lien of and security interests created by the mortgage and to any and all renewals, extensions, modifications, substitutions, or replacements thereof.  Without limiting the generality of the foregoing, all of the Tenant's rights, including but not limited to any rights granted to the Tenant in the Lease with respect to any award in condemnation, shall be subject and subordinate in all respects to the rights of the Mortgagee under the Mortgage.

2.	**Nondisturbance and Attornment.**  So long as the Tenant is not in default under the Lease in the payment of rent or in the observance or performance of any of the other terms, covenants, or conditions contained herein or in the Lease and on the Tenant's part to be observed and performed,

(a)	The Tenant's possession of the premises demised by the Lease and the Tenant's rights and privileges under the Lease, or any extensions or renewals thereof which may be effected in accordance with any option therefor in the Lease, shall not be diminished or interfered with by the Mortgagee, and the Tenant's occupancy of said premises shall not be disturbed by the Mortgagee for any reason whatsoever during the term of this Lease or any such extensions or renewals thereof;

(b)	The Mortgagee will not join the Tenant as a part defendant in any action or proceeding for the purpose of terminating the Tenant's interest and estate under the Lease because of any default under the Mortgage;

(c)	In the event of foreclosure of the Mortgage, the mortgaged properties therein described shall be conveyed together with the Lease but subject to this Agreement, and the Tenant shall thereafter attorn to the purchaser of the mortgaged properties at the foreclosure sale, whether such purchaser be the Mortgagee or a third party, and the Tenant shall thereafter be obligated to such purchaser to perform all of Tenant's obligations under the Lease, and the Tenant shall have no right to terminate the Lease by reason of the foreclosure of the Mortgage, so long as the Tenant's

34

peaceable and quiet use and possession of said premises shall not be disturbed by reason thereof. Such purchaser shall be bound to the Tenant under all of the terms, covenants, and conditions of the Lease, and the Tenant shall, from and after such purchaser's succession to the interest of the lessor under the Lease, have the same remedies against such purchaser for the breach of an agreement contained in the Lease that the Tenant might have had under the Lease against the lessor if such purchaser had not succeeded to the interest of the lessor; **PROVIDED, HOWEVER,** that such purchaser shall not be (i) liable for any act or omission of any prior lessor; or (ii) subject to any offsets or defenses which the Tenant might have had against any prior Lessor; (iii) bound by any amendment or modification of the Lease made without the Mortgagee's prior written consent; but nothing herein contained shall be construed as a waiver of any rights which the Tenant may have against any prior lessor immediately prior to the event of foreclosure, or (iv) bound by any provision in the Lease which obligates the Landlord to construct or complete any building or structure or to make any improvements or to perform any other construction work (including any work necessary to prepare the Premises for Tenant's occupancy).

3. **General.**

    (a)    The Tenant will not, without the prior written consent of the Mortgagee, pay to any lessor any rental under the Lease (except security deposits) more than thirty (30) days in advance of its due date; and

    (b)    To the extent that the Lease shall entitle the Tenant to notice of any mortgage, this Agreement shall constitute such notice to the Tenant with respect to the Mortgage.

4. **Miscellaneous.**

    (a)    This Agreement may not be modified orally or in any other manner than by an agreement in writing signed by the parties hereto or their respective successors and assigns; and

    (b)    This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns.

35

**IN WITNESS WHEREOF**, the parties hereto have hereunto caused this Agreement to be duly executed as of the day and year first above written.

MORTGAGEE:

_____

By_____

TENANT:

HY-VEE, INC.

By_____
    Ronald D. Pearson
    Chief Executive Officer and Chairman

By_____
    James D. Meyer, Asst. Secretary

STATE OF _____ )
                          ) ss.
_____ COUNTY )

        The foregoing instrument was acknowledged before me this ___ day of _____, 20__, by _____, _____, of _____, a national banking association, on behalf of the association.

                                      _____
                                      Notary Public in and for
                                      The State of _____

STATE OF IOWA     )
                           ) ss.
POLK COUNTY     )

        On this ___ day of _____, 20__, before me, the undersigned, a Notary Public in and for the state of Iowa, personally appeared Ronald D. Pearson and James D. Meyer, to me personally known, who being by me duly sworn did say that they are the Chief Executive Officer and Chairman and Assistant Secretary, respectively, of Hy-Vee, Inc., that the seal affixed hereto is the seal of said corporation; that said instrument was signed and sealed on behalf of said corporation by authority of its Board of Directors; and that the said Ronald D. Pearson and James D. Meyer as such officers acknowledged the execution of said instrument to be the voluntary act and deed of said corporation, by it and by them voluntarily executed.

                                      _____
                                      Notary Public in and for
                                      The State of Iowa

37

TENANT ESTOPPEL LETTER

TO: _____
_____
_____

J.A. Peterson Enterprises, Inc.
10000 W. 75th Street, Suite 100
Shawnee Mission, KS 66204

RE: **Creekwood Commons Shopping Center**
Clay County, Missouri

Tenant: **HY-VEE, INC**.
Leased Premises: _____

Ladies and Gentlemen:

The undersigned is the Tenant under a Lease dated _____ ("Lease") between **J.A. PETERSON ENTERPRISES, INC.**, a Missouri corporation ("Landlord") and the undersigned as Tenant ("Tenant"), for Tenant's leased space ("the Leased Premises") containing approximately 77,000 square feet in the Creekwood Commons Shopping Center in Kansas City, Clay County, Missouri and more particularly described in the Lease (the "Shopping Center"). Tenant understands that you _____ to _____ the Shopping Center and that as a condition of your obligation to _____ the Shopping Center, you have asked Tenant to furnish, and Tenant, in accordance with the requirements of the Lease, is willing to furnish the following information:

1. The Lease attached hereto as Exhibit A is a true, correct, and complete copy of the Lease, with all amendments thereto. The Lease is in full force and effect; any applicable free rent period has expired; all rental payments under the Lease have been paid through _____; and no rent has been nor shall be paid more than one month in advance (other than the security deposit referred to in paragraph 11 hereof) by Tenant other than as follows:

2. Tenant is paying the following amount as monthly basic rent under the Lease: $_____

3. The monthly basic rent under the Lease will increase on _____ to the following:

In addition to the basic monthly rental payments payable under the Lease, Tenant is obligated to pay to Landlord the following amounts of additional rent:    Common Area Maintenance - $_____ Taxes - $_____, _____

5. Tenant has no claims against Landlord, nor has Tenant made any claims against Landlord, and, to the best of Tenant's knowledge, Landlord is not in default under the Lease.

6. Tenant took possession of the Leased Premises as of _____, and is currently operating its business therein, and Landlord has fulfilled all of Landlord's obligations under the Lease in connection with any improvements required by the terms of the Lease to be made by Landlord or construction of repairs to, or remodeling of, the Leased Premises.

38

7. The term of the Lease commenced on _____, and terminates on _____, subject to the following options or rights to renew:

8. Tenant, as of this date, has no charge, lien, or claim or right of offset or reimbursement under the Lease, or otherwise, against rents or other charges due or to become due thereunder, and Tenant has no unsatisfied claims against Landlord.

9. Tenant is not in default under the Lease. Tenant has not assigned, transferred or hypothecated the Lease or any interest therein or subleased all or any portion of the Leased Premises. Tenant has not declared bankruptcy

10. There have been no amendments to the Lease and there are no other agreements or understandings, written or oral, between Tenant and Landlord regarding the Shopping Center or the Leased Premises, except as attached hereto.

11. Tenant has delivered to Landlord a cash security deposit of $-0-, which has not been returned to Tenant or any other party for the benefit of Tenant.

12. Tenant does not have any option to purchase all or any portion of the Shopping Center or the Leased Premises.

13. All references herein to Landlord shall apply to Landlord's predecessors, successors, and assigns. Tenant understands that you are relying on Tenant's representations in this letter in order to _____ the Shopping Center, and Tenant further understands that the holder of any mortgage encumbering the Shopping Center at any time after the date hereof will rely on Tenant's representations herein in order to make a mortgage loan in connection with the _____ of the Shopping Center, and that Tenant shall be estopped to deny the representations of Tenant contained in this letter.

    IN WITNESS WHEREOF, Tenant has executed this instrument this _____ day of _____, 20___.

TENANT:

**HY-VEE, INC.**, an Iowa corporation.

By: _____
Title: _____

39

## EXHIBIT E

## EXISTING LEASE SURRENDER CLAUSE

Section 8.03. Condition of Premises at Termination. At the expiration of this Lease, by lapse of time or otherwise, Tenant will quit and surrender the Leased Premises in as good a state and condition as they were on the date on which Tenant took possession, reasonable use and wear thereof, damage by fire and other casualty, and changes, alterations or additions provided under Section 8.02 excepted. All alterations, additions, erections or improvements in the Leased Premises at the expiration of this Lease, except furniture, trade fixtures or signs paid for by Tenant, shall be and become a part of the Leased Premises, and shall remain upon and be surrendered with the Leased Premises as a part thereof at the expiration of this Lease.

# EXHIBIT F

## EXCLUSIVE USES

## CREEKWOOD COMMONS SHOPPING CENTER

(Updated: 10/17/02)

1. **FAMOUS FOOTWEAR**
   Date Executed: February 25, 1988

   Article XIII:    So long as Famous Footwear operates its business in its leased premises, no more than 5% of the leasable square footage of the Shopping Center (in addition to the premises leased to Famous Footwear) to tenants who will use such premises primarily for the sale of shoes without Tenant's prior written consent. The foregoing restriction shall not apply to any premises within the Shopping Center which sells shoes as an incidental or "Ancillary Use" of such premises. The term "Ancillary Use" as used herein shall be deemed to mean that portion of a tenant's business comprising less than 50% of its retail business from its premises in the Shopping Center.

2. **FUNCO LAND**
   Date Executed: November 16, 1994

   Section 5(A):    No portion of the Shopping Center shall be used or operated primarily for the retail sale or rental of new or previously owned Nintendo, Sega/Genesis or compact disc based video games, together with related computer hardware. The foregoing restriction shall not apply to any new leases in the Shopping Center for more than ten thousand (10,000) rentable square feet.

3. **H & R BLOCK**
   Date Executed: April 1, 1994

   Section 6.03:    So long as H & R Block continues to use its premises for its permitted use and is not in default under its lease, no space in the Shopping Center shall be used for the primary use of accounting and/or tax preparation services without H & R Block's prior written consent.

4. **NORWEST FINANCIAL**
   Date Executed: March 30, 1990

   Article XIII:  No premises within the confines of the Shopping Center (other than the

41

premises of Norwest Financial and those premises described below) shall be primarily used as Norwest Financial's an office providing general loan, finance and financial services, without prior written consent. The foregoing covenant shall not apply to: (i) the lease of any premises in the Shopping Center which is already leased as of the date of execution of the Norwest Financial lease, (ii) any premises in the Shopping Center which is not owned by Landlord, (iii) the assignees, sublessees or successors to those premises; (iv) any premises within the Shopping Center which provides such services as an incidental or ancillary use of such premises; and (v) any commercial bank, savings bank or savings and loan.

5    **GORDMANS**

Rider:  So long as the Leased Premises are operated by Tenant under Tenant's Trade Name, then no part of the Shopping Center shall be leased to any of the following: (a) Mervyns, Kohl's, Ross Department Stores, T. J. Maxx, Goody's or Steinmart; or (b) Goodwill or Salvation Army.

6.   **PIZZA STREET**
     Date Executed: June 7, 1999

     Basic Lease Information:          Pizza Street shall be the only restaurant serving pizza as its primary menu item within the confines of Creekwood Commons Shopping Center.  This will include pad sites owned by the Landlord.

7    **CELSUIS TANNERY**
     Date Executed: Nov. 9, 2001

     Exhibit D:     No space in the Shopping Center shall be used for the primary use of a tanning salon without the written consent of Celsius Tannery.

8.   **CARDS N' MORE**
     Date Executed: November ___, 1989

                     Cards N' More, Inc. will be the only business operating exclusively as a card shop allowed in the Shopping Center.  In addition, Cards N' More, Inc. will be the only business to offer wedding supplies and invitations, except those businesses which offer said items as an incidental or ancillary portion of its business and product line.

9.     **COUNTRYWIDE HOME LOANS, INC.**

Date Executed: December 21, 1998

Section 5(A):   No space in the Shopping Center will be used for the primary use for residential mortgage home loan lending or related usage.

10.     **GREAT CLIPS**

    Date Executed: August 1, 2002

    Section 25.16     Tenant will have the exclusive right in the Shopping Center for a budget priced hair salon.

## EXHIBIT G

RESTRICTIONS

(A)  (1)  No part of the Shopping Center (including the Demised Premises) shall be used except for commercial and/or retail sales and service and appurtenant uses.  Service uses may include but not limited to automobile products, financial institutions, brokerage offices, travel and other agencies and similar service establishments.

(2)  In no event shall any use of the Shopping Center (including the Demised Premises) be made or operation conducted thereon which use or operation is obnoxious to a first class shopping center, including the following:

Any public or private nuisance; any noise or sound which is routine to the operation of a business on the Demised Premises that is objectionable due to intermittence, beat, frequency, shrillness, or loudness; any obnoxious odor which is routine to the operation of a business on the such Premises; any noxious, toxic, caustic, or corrosive fuel or gas which presents a hazard to the safety of persons on the Shopping Center; any unusual fire, explosive, or other damaging or dangerous hazard including the storage, display or sale of explosives or fireworks; any manufacturing (except in connection with and incidental to retail sales on premises), distillation, refining, smelting, agriculture, or mining operations; any mobile home or trailer court, labor camp, junk yard, stock yard, or animal raising shop that boards animals; any dumping, disposal incineration, reduction of garbage or refuse (other than pursuant to the normal operation of a business within a first class shopping center); any fire or bankruptcy sale or auction house operation; any automobile sales, leasing or display, including body repair facilities; living quarters, sleeping apartments or lodging rooms; any mortuary; any adult bookstore selling as its primary product pornographic material (as that term is understood by the general public and not necessarily by law); any trailer rental; any auditorium or convention center; and any drilling or other work for removal of subsurface substances.

(3)  No part of the Shopping Center located within 175 feet from the Demised Premises shall be used for a restaurant (sit down or carry out).

(B)  Additionally, in no event shall the following specific uses be carried upon the Demised Premises:

(1)  Bowling alley, skating rink, any second-hand, army, navy or governmental surplus store, theater, amusement park, carnival, entertainment facility, disco or other dance hall, tavern or nightclub establishment, sporting event or other sports facility, sale or repair (new or used) of cars, trailers or mobile homes, video or other game parlor, pool hall, billiard parlor, amusement center, off-track betting, flea market, massage parlor, auditorium, car wash, or

(2)     Except as incidental to Tenant's primary use as a supermarket: (a) meeting hall, (b) banquet facility, (c) video tape store, or (d) health spa.

# EXHIBIT H

## TENANT'S WORK

## DESCRIPTION OF TENANT'S WORK

All work required to complete and place the Demised Premises in finished condition for opening for business shall be furnished by Tenant and at Tenant's expense, in accordance with this Exhibit.

Tenant shall remove trash daily and shall not permit trash to accumulate within the Demised Premises or in any common area.

### Approvals and General.

1.      Tenant shall secure Owner's approval of Tenant's Work which is structural or affects the exterior of the Demised Premises, including designs, plans and specifications, permits, licenses and contractors to be used in performing the same.  All approvals by Owner or Architect must be in writing and oral approvals shall be of no force or effect.  All Tenant's Work with respect to gas, water, electrical and telephone construction or installations shall also be subject to approval by the utility company furnishing the service.

2.      All work by Tenant shall comply with all applicable statutes, ordinances, regulations and codes and with the recommendations of Landlord's hazard insurance carrier.

3.      Landlord shall not be liable for any defects in labor or materials incorporated in Tenant's Work or for the defective design thereof (whether or not Landlord or Landlord's architect or contractor approved the same), the sole risk of the type, design and quality of the construction of Tenant's Work to be borne by Tenant.

# EXHIBIT I

## RULES AND REGULATIONS

All capitalized terms used herein, which are not otherwise defined herein, shall have the respective meanings ascribed to them in the Lease. The following rules and regulations are in effect for the Shopping Center as of the Date of the Lease.

1. Use of the roof is reserved for Landlord, except to the extent required for the installation and maintenance of HVAC equipment by Tenant with the prior written approval of Landlord.

2. Use of Common Areas for display racks, tables, sign standards, boxes or other purposes is expressly forbidden unless authorized in writing by Landlord.

3. Loud speakers, televisions, phonographs, radios, flashing lights, or other similar devices shall not be used in a manner so as to be heard or seen outside the Premises. Handbills or other printed matter may not be distributed by Tenant in the Common Areas.

4. Tenant shall at all times keep the Premises in an orderly and sanitary condition. Common Areas shall not be used by Tenant for temporary trash storage, nor shall trash containers located in the Common Areas be used for trash disposal.

5. No animals of any kind are allowed in the Shopping Center by Tenant (except for "seeing eye" dogs and those in pet stores).

6. Tenant shall keep the Premises at temperatures sufficiently high to prevent freezing of water pipes and fixtures.

7. Plumbing facilities will not be used for any purpose other than that for which they are constructed. No foreign substance of any kind shall be deposited therein. The expense of any breakage, stoppage, or damages resulting from a violation of this rule shall be borne by Tenant if Tenant or its employees or invitees shall have caused the breakage, stoppage or damage. Any restaurant facilities shall be responsible for the cost of regular maintenance in cleaning of the grease traps servicing their Premises.

8. Tenant's employees shall use only those portions of the parking areas of the Shopping Center as may be reasonably designated by Landlord. Tenant shall, if requested by Landlord, furnish a complete list of the license plate numbers of all vehicles operated by Tenant's employees. Such vehicles may be towed at Tenant's expense if parked in areas other than those reasonably designated by Landlord.

9. There shall be no cooking or preparation of food on the Premises or the sale or use of alcoholic beverages from or on the Premises other than as permitted pursuant to the Lease

other than the relationship of landlord and tenant.

36.  **NOTICES.**

      A.     All notices, consents, approvals, and other communications which may or are required to be served or given under this Lease (collectively, "Notices"), shall be in writing and shall be given by one of the methods set forth below to the party at its address or facsimile number set forth below or such other address or facsimile number as the party may later specify. Each Notice shall be deemed given and received:

      (1)     If hand delivered, when the delivery is made;

      (2)     If sent by first-class mail (registered or certified), return receipt requested, postage prepaid, two (2) business days after it is posted with U.S. Postal Service;

      (3)     If sent by facsimile transmission, when transmitted to the party's facsimile number during normal business hours and confirmation of complete receipt is received by the transmitting party; or

      (4) If sent by a nationally recognized overnight delivery service, the day on which the Notice is actually received by the party.

      B.     The parties' addresses and facsimile numbers for the purposes of this Lease are as follows:

TENANT:      Hy-Vee, Inc.
      5820 Westown Parkway
      West Des Moines, Iowa 50266
      515-267-2967 (facsimile number)
      Attention:     Dennis Ausenhus
                  Vice President-Real Estate/Engineering

With a copy to:
      Hy-Vee, Inc.
      5820 Westown Parkway
      West Des Moines, Iowa 50266
      (515-327-2162 (facsimile number)
      Attention:     James D. Meyer
                  Vice President and Corporate Counsel

LANDLORD:      J.A. Peterson Enterprises, Inc.
      10000 W. 75th Street, Suite 100,
      Shawnee Mission, Kansas 66204
      Attention:     Kenneth L. Riedemann
      913-384-9605 (facsimile number)

22

without the prior written consent of the Landlord, which consent shall not be unreasonably withheld or delayed.

10.    The entrance doors to the Premises shall remain locked at all times when the Premises are not in use.

11.    Tenant shall maintain control of, and be responsible for, all keys issued to Tenant for the Shopping Center and Premises, and shall return all such keys to Landlord upon termination of the Lease.

12.    Landlord shall have the right to control and operate the Common Areas and all facilities furnished for the common use of Landlord's tenants, in such manner as it deems best for the benefit of such tenants generally.  No tenant shall invite to its premises, or permit the visit of, persons in such numbers or under such conditions as to interfere with the use and enjoyment of the entrances, corridors, elevators, if any, and facilities of the Shopping Center by other tenants.

13.    The outside areas immediately adjoining the Premises shall be kept clean and free from dirt and rubbish by Tenant, and Tenant shall not place, suffer or permit any obstruction or merchandise in such areas.

14.    Tenant shall not place, suffer or permit displays, decorations or shopping carts in parking areas or driveways, provided, however, subject to Landlord's prior approval of the locations thereof (which approval shall not be unreasonably withheld or delayed), shopping carts shall be permitted in cart corrals to be constructed by Tenant within Tenant's Prime Parking Area.

15.    Subject to Landlord's prior approval of the size, appearance and location thereof (such approval not to be unreasonably withheld or delayed), Tenant shall have the right to operate a "garden center" within Tenant's Prime Parking Area.

J A PETERSON ENTERPRISES, INC
10000 W 75TH ST
SHAWNEE MISSION KS 66204-

Neighborhood and Community Services Department
Regulated Industries Division
635 Woodland Avenue, Suite 2101
Kansas City, Missouri 64106

Parcel No. 223230

*Notice of Application for new Alcoholic Beverage License.*
**Eligible Consenter:**

Our office has received an application for an alcoholic Beverage License to be located at: 207 NW Englewood (Hy-Vee). The applicant is proposing to operate a Full Liquor Package Store with Sunday at that location.

CHAPTER 10 of the Administrative Code of Kansas City requires that our office provide a notice to you that the application has been filed because your property has boundaries within 250 feet of the front entrance to the premise. Chapter 10 also requires that the applicant obtain signed and notarized consent affidavits from a majority of the property owners within 250 feet of the proposed premise prior to issuance of the license. Our office has prepared a consent affidavit specifically identifying your parcel(s) and it contains additional information regarding the applicant's planned hours of operation and entertainment. The applicant will contact you directly or in writing, and you may provide or withhold consent as you choose. However, if you do not indicate opposition to the application, in writing, the applicant may furnish consent from a tenant of your property under the following conditions:

*(1)   That tenancy is for a term not less than one year; and*
*(2)   That applicant shall furnish to the director sufficient proof that the applicant has sent a notification to the eligible consenting owner in a form approved by the director, by U. S. Certified mail; and*
*(3)   That the notification shall include the date of application, name and address of the applicant, the name and address of the proposed establishment, the type of license applied for, the proposed hours of operation, the proposed type of entertainment, if any, a statement that if the owner does not file an objection with director within 30 days of the date of the certified mailing of the notification, then the director will accept the signed consent of the tenant, the name, address, telephone and facsimile numbers of the director's office and instructions to the property owner for filing an objection to accepting the signed consent of the tenant.* **CHAPTER 10, Sec. 10-332 (b) 1-3**

The code further allows property owners within 350 feet of the proposed premise to circulate a petition requesting a hearing to determine whether the issuance of the license will be in the best interests of the locality involved. If a petition containing the signatures of not less than 50% of the owners is received in our office by January 16, 2004, you will receive a notice of the date, time and place of the hearing. For your information, a listing of property owners eligible to sign a petition is attached. As an eligible consenter, if you dispute the approval of a license or permit, or the location of premises to be used for the sale of alcoholic beverages, you may file an appeal with the Board of Liquor review according to the provisions of Sec. 10-62.

If you desire additional information regarding this application or if you desire to receive notice of the director's final decision, please telephone the undersigned investigator at 784- 9018 by January 16, 2004.

_____          12-10-03
Investigator                                      Date
Regulated Industries

**CERTIFICATE OF SERVICE**

Now on this 11th day of December, 2003, I, the undersigned, do hereby certify that a true copy of the foregoing was mailed to the above person(s).

_____
Jeriea Mitchell

| | | address | | kiva pin | owner | | city / state | zip | distance |
|---|---|---|---|---|---|---|---|---|---|
| 201 | NE | ENGLEWOOD | RD | 223230 | J A PETERSON ENTERPRISES, INC | 10000 W 75TH ST | SHAWNEE MISSION KS | 66204- | 250 ft |
| 203 | NE | ENGLEWOOD | RD | 223230 | J A PETERSON ENTERPRISES, INC | 10000 W 75TH ST | SHAWNEE MISSION KS | 66204- | 250 ft |
| 207 | NE | ENGLEWOOD | RD | 223230 | J A PETERSON ENTERPRISES, INC | 10000 W 75TH ST | SHAWNEE MISSION KS | 66204- | 250 ft |
| 211 | NE | ENGLEWOOD | RD | 223230 | J A PETERSON ENTERPRISES, INC | 10000 W 75TH ST | SHAWNEE MISSION KS | 66204- | 250 ft |
| 215 | NE | ENGLEWOOD | RD | 223230 | J A PETERSON ENTERPRISES, INC | 10000 W 75TH ST | SHAWNEE MISSION KS | 66204- | 250 ft |
| 301 | NE | ENGLEWOOD | RD | 223230 | J A PETERSON ENTERPRISES, INC | 10000 W 75TH ST | SHAWNEE MISSION KS | 66204- | 250 ft |
| 303 | NE | ENGLEWOOD | RD | 223230 | J A PETERSON ENTERPRISES, INC | 10000 W 75TH ST | SHAWNEE MISSION KS | 66204- | 250 ft |
| 305 | NE | ENGLEWOOD | RD | 223230 | J A PETERSON ENTERPRISES, INC | 10000 W 75TH ST | SHAWNEE MISSION KS | 66204- | 250 ft |
| 307 | NE | ENGLEWOOD | RD | 223230 | J A PETERSON ENTERPRISES, INC | 10000 W 75TH ST | SHAWNEE MISSION KS | 66204- | 250 ft |
| 309 | NE | ENGLEWOOD | RD | 223230 | J A PETERSON ENTERPRISES, INC | 10000 W 75TH ST | SHAWNEE MISSION KS | 66204- | 250 ft |
| 311 | NE | ENGLEWOOD | RD | 223230 | J A PETERSON ENTERPRISES, INC | 10000 W 75TH ST | SHAWNEE MISSION KS | 66204- | 250 ft |
| | | NO ADDRESS | | 223230 | J A PETERSON ENTERPRISES, INC | 10000 W 75TH ST | SHAWNEE MISSION KS | 66204- | 250 ft |
| | | NO ADDRESS | | 223231 | J A PETERSON ENTERPRISES, INC | 10000 W 75TH ST | SHAWNEE MISSION KS | 66204- | 250 ft |

12/1/2003
2:32 PM

J A PETERSON ENTERPRISES, INC
10000 W 75TH ST
SHAWNEE MISSION KS 66204-

Neighborhood and Community Services Department
Regulated Industries Division
635 Woodland Avenue, Suite 2101
Kansas City, Missouri 64106

Parcel No. 223231

*Notice of Application for new Alcoholic Beverage License.*
**Eligible Consenter:**

Our office has received an application for an alcoholic Beverage License to be located at: 207 NW Englewood (Hy-Vee). The applicant is proposing to operate a Full Liquor Package Store with Sunday at that location.

CHAPTER 10 of the Administrative Code of Kansas City requires that our office provide a notice to you that the application has been filed because your property has boundaries within 250 feet of the front entrance to the premise. Chapter 10 also requires that the applicant obtain signed and notarized consent affidavits from a majority of the property owners within 250 feet of the proposed premise prior to issuance of the license. Our office has prepared a consent affidavit specifically identifying your parcel(s) and it contains additional information regarding the applicant's planned hours of operation and entertainment. The applicant will contact you directly or in writing, and you may provide or withhold consent as you choose. However, if you do not indicate opposition to the application, in writing, the applicant may furnish consent from a tenant of your property under the following conditions:

*(1)  That tenancy is for a term not less than one year; and*
*(2)  That applicant shall furnish to the director sufficient proof that the applicant has sent a notification to the eligible consenting owner in a form approved by the director, by U. S. Certified mail; and*
*(3)  That the notification shall include the date of application, name and address of the applicant, the name and address of the proposed establishment, the type of license applied for, the proposed hours of operation, the proposed type of entertainment, if any, a statement that if the owner does not file an objection with director within 30 days of the date of the certified mailing of the notification, then the director will accept the signed consent of the tenant, the name, address, telephone and facsimile numbers of the director's office and instructions to the property owner for filing an objection to accepting the signed consent of the tenant.  **CHAPTER 10, Sec. 10-332 (b) 1-3***

The code further allows property owners within 350 feet of the proposed premise to circulate a petition requesting a hearing to determine whether the issuance of the license will be in the best interests of the locality involved. If a petition containing the signatures of not less than 50% of the owners is received in our office by January 16, 2004, you will receive a notice of the date, time and place of the hearing. For your information, a listing of property owners eligible to sign a petition is attached. As an eligible consenter, if you dispute the approval of a license or permit, or the location of premises to be used for the sale of alcoholic beverages, you may file an appeal with the Board of Liquor review according to the provisions of Sec. 10-62.

If you desire additional information regarding this application or if you desire to receive notice of the director's final decision, please telephone the undersigned investigator at 784- 9018 by January 16, 2004.

_____
Investigator
Regulated Industries

12-10-03
_____
Date

**CERTIFICATE OF SERVICE**

Now on this 11th day of December, 2003, I, the undersigned, do hereby certify that a true copy of the foregoing was mailed to the above person(s).

_____
Jeriea Mitchell

| | | address | | kiva pin | owner | | city / state | zip | distance |
|---|---|---|---|---|---|---|---|---|---|
| 201 | NE | ENGLEWOOD | RD | 223230 | J A PETERSON ENTERPRISES, INC | 10000 W 75TH ST | SHAWNEE MISSION KS | 66204- | 250 ft |
| 203 | NE | ENGLEWOOD | RD | 223230 | J A PETERSON ENTERPRISES, INC | 10000 W 75TH ST | SHAWNEE MISSION KS | 66204- | 250 ft |
| 207 | NE | ENGLEWOOD | RD | 223230 | J A PETERSON ENTERPRISES, INC | 10000 W 75TH ST | SHAWNEE MISSION KS | 66204- | 250 ft |
| 211 | NE | ENGLEWOOD | RD | 223230 | J A PETERSON ENTERPRISES, INC | 10000 W 75TH ST | SHAWNEE MISSION KS | 66204- | 250 ft |
| 215 | NE | ENGLEWOOD | RD | 223230 | J A PETERSON ENTERPRISES, INC | 10000 W 75TH ST | SHAWNEE MISSION KS | 66204- | 250 ft |
| 301 | NE | ENGLEWOOD | RD | 223230 | J A PETERSON ENTERPRISES, INC | 10000 W 75TH ST | SHAWNEE MISSION KS | 66204- | 250 ft |
| 303 | NE | ENGLEWOOD | RD | 223230 | J A PETERSON ENTERPRISES, INC | 10000 W 75TH ST | SHAWNEE MISSION KS | 66204- | 250 ft |
| 305 | NE | ENGLEWOOD | RD | 223230 | J A PETERSON ENTERPRISES, INC | 10000 W 75TH ST | SHAWNEE MISSION KS | 66204- | 250 ft |
| 307 | NE | ENGLEWOOD | RD | 223230 | J A PETERSON ENTERPRISES, INC | 10000 W 75TH ST | SHAWNEE MISSION KS | 66204- | 250 ft |
| 309 | NE | ENGLEWOOD | RD | 223230 | J A PETERSON ENTERPRISES, INC | 10000 W 75TH ST | SHAWNEE MISSION KS | 66204- | 250 ft |
| 311 | NE | ENGLEWOOD | RD | 223230 | J A PETERSON ENTERPRISES, INC | 10000 W 75TH ST | SHAWNEE MISSION KS | 66204- | 250 ft |
| | | NO ADDRESS | | 223230 | J A PETERSON ENTERPRISES, INC | 10000 W 75TH ST | SHAWNEE MISSION KS | 66204- | 250 ft |
| | | NO ADDRESS | | 223231 | J A PETERSON ENTERPRISES, INC | 10000 W 75TH ST | SHAWNEE MISSION KS | 66204- | 250 ft |

12/1/2003
2:32 PM

EXHIBIT B

**Description:**

LOT 1: CREEKWOOD OAKS THIRD PLAT, Kansas City, Missouri

This is a survey and lot split of Tract 1, CREEKWOOD OAKS THIRD PLAT, a subdivision in Kansas City, Clay County, Missouri, according to the recorded plat thereof, being more particularly described as follows:

Tract 1-A is that real property legally described as follows:

All that part of Tract 1, CREEKWOOD OAKS THIRD PLAT, a subdivision in Kansas City, Clay County, Missouri, according to the recorded plat thereof, being more particularly described as follows:

Beginning at the Northwest corner of said Tract 1; thence South 89°26'42" East along the North line of said Tract 1, 337.62 feet; thence South 0°33'45" West, 190.90 feet; thence South 89°26'15" East, perpendicular to the last described course, a distance of 225.25 feet; thence North 0°33'45" East, perpendicular to the last described course, a distance of 144.40 feet to a point on the Southwesterly right-of-way line of NE. Englewood Road; thence South 71°53'29" East along said Southwesterly line and along the Northeasterly line of said Tract 1, a distance of 11 feet to an angle point thereon; thence South 89°26'42" East along the Southerly right-of-way line of said NE. Englewood Road and along the North line of said Tract 1, a distance of 256.61 feet; thence South 0°31'46" East along the East line of said Tract 1, a distance of 60 feet; thence South 89°26'43" East along the North line of said Tract 1, a distance of 115 feet to a point on the West right-of-way line of North Oak Street Trafficway, as now established; thence the following courses and distances along the East line of said Tract 1; thence South 0°31'47" West, 99.76 feet; thence North 89°27'26" West, 30 feet; thence South 45°36'30" West, 212.94 feet; thence South 0°31'46" West, 183.86 feet; thence South 89°26'15" East, 208.16 feet; thence South 0°31'47" West, 48 feet; thence North 89°26'15" West, 208.16 feet; thence South 0°31'47" West, 276.77 feet; thence South 89°26'14" East, 208.16 feet to a point on the West right-of-way line of said North Oak Street Trafficway; thence South 0°31'47" West along said West right-of-way line and along the East line of said Tract 1, 45 feet to the Southeast corner thereof; thence North 89°26'14" West along the Southerly line of said Tract 1, 344.57 feet to an angle point thereon; thence North 45°38'30" West along said Southerly line, 71.51 feet; thence North 89°26'14" West along said Southerly line, 85.48 feet to a jog in said Southerly line; thence North 0°31'47" East along said jog, 4.50 feet; thence North 71°13'17" West along said Southerly line, 175.85 feet; thence North 89°26'15" West along said Southerly line, 386.00 feet to the Southwest corner of said Tract 1, being also a point on the West line of said Quarter-Quarter Section; thence North 0°29'28" East along said West line and along the West line of said Tract 1, 887.45 feet to the Point of Beginning.

Tract 1-B is that real property legally described as follows:

All that part of Tract 1, CREEKWOOD OAKS THIRD PLAT, a subdivision in Kansas City, Clay County, Missouri, according to the recorded plat thereof, being more particularly described as follows: Commencing at the Northwest corner of said Tract 1; thence South 89°26'42" East along the North line of said Tract 1, a distance of 337.62 feet to the Point of Beginning of the parcel of land to be herein described; thence continuing South 89°26'42" East along said North line, 92.13 feet to a point on the Northeasterly line of said Tract 1, being also a point on the Southwesterly right-of-way line of NE. Englewood Road, as now established; thence South 71°53'29" East along said Northeasterly line and along said Southwesterly right-of-way line, a distance of 154.31 feet; thence South 0°33'45" West, 144.40 feet; thence North 89°26'15" West, perpendicular to the last described course, a distance of 225.25 feet; thence North 0°33'45" East, perpendicular to the last described course, a distance of 190.90 feet to the Point of Beginning.

**General Notes**

1. As of August 5, 1999, we have made no investigation for, or locations of, possible usable subsurface areas of private land or public ways, including, but not limited to, utility vaults of any nature, utility or pedestrian tunnels, underwalk area ways, under alley area ways, fuel storage bins or tanks, elevator pits, and all or any combination of the above, except as shown, noted and described hereon.
2. Information shown on this survey was taken from Chicago Title Insurance Company Commitment No. 0088314456, effective date, June 3, 1999
3. TRACT 1 A, CREEKWOOD OAKS THIRD PLAT, Kansas City, Clay County, Missouri contains 956,706 sq.ft. or 21.963 acres, more or less. TRACT 1 B, CREEKWOOD OAKS THIRD PLAT, Kansas City, Clay County, Missouri contains 42,259 sq.ft or 0.970 acres, more or less.
4. KCP & L Esm't. Doc. No. G-47877, Bk 228/Pg. 287 affects Lot 1, CREEKWOOD, Gladstone, Clay County, Missouri (No size or location of easement stated).
5. A reciprocal easement affects the surveyed tracts recorded in Doc. No. G-159 Bk. 1825/Pg. 343 and in Book 1827, Page 788, as Doc. No. G-45781 and in Book 1927 Page 810, as Doc. No. G-45782 and in Book 1855, Page 341 as Doc. No. G-13260
6. Reciprocal Esm't. Agreement affects this survey as Doc. No. G-47494 in Bk. 1831/Pg. 563.
7. Unrecorded agreement by Sullivan Hayes Company and Kansas City Power & Light Co. affects this survey.
8. Parcel I Contains 24,909 Acres. Parcel II Contains 1.456 acres more or less.
9. Terms and provisions of easement to maintain storm water detention facility recorded by Document No. G-13268 in book 1855 at Page 382 affects this survey.
10. Terms and provisions of Improvement and Maintenance Agreement recorded in Book 1932 at Page 507 as Document No. G-47877.
11. Terms and provisions of Slope Maintenance Agreement recorded in Book 1944 at Page 424 as Document No. G-53372.
12. Terms and provisions of Access Easement Agreement recorded in Book 2285 at Page 473 as Document No. L-93741.
13. Unrecorded sewer easement covering the North Half and South Half of Vacated 58th Street.
14. Unrecorded Cable Television Easement over vacated 58th Street.

PARKING DATA:
TRACT 1A & 1B

REGULAR STALLS = 1125
HANDICAPPED STALLS = 22

TOTAL STALLS = 1147

TOTAL BUILDING AREA = 209,325 SF
(5.48 STALLS/1000 SF)

REVISION | DATE BY

LOCATION:
KANSAS CITY #2, MO
CREEKWOOD COMMONS

HY-VEE, INC.
5820 WESTOWN PARKWAY
WEST DES MOINES, IOWA 50266
TELEPHONE: (515) 267-2800
FAX: (515) 267-2935

SITE PLAN

| DRAWN | DATE |
|---|---|
| BMB | OCTOBER 2 |
| SCALE | |
| 1"=60' | |

SHEET
C1.0





EXHIBIT B

Creekwood Commons
301 NE Englewood Rd.
KC, MO Gladstone